Robert J. Hicks, State Bar #204992
Email: Robert.Hicks@streamkim.com
Theodore K. Stream, State Bar #138160
Email: Ted.Stream@streamkim.com
Andrea Rodriguez, State Bar #290169
Email: Andrea.Rodriguez@streamkim.com
**STREAM KIM HICKS WRAGE & ALFARO, PC**
3403 Tenth Street, Suite 700
Riverside, CA 92501
Telephone: (951) 783-9470
Facsimile: (951) 783-9475

Attorneys for Defendant,
CALIFORNIA REGIONAL MULTIPLE
LISTING SERVICE, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| The PLS.com, LLC, a California limited liability company, | CASE NO. 2:20-cv-04790-PA (RAOx) |
| Plaintiff, | **NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) FILED BY DEFENDANT CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC.** |
| vs. | |
| The National Association of Realtors; Bright MLS, Inc.; Midwest Real Estate Data, LLC; and California Regional Multiple Listing Service, Inc., | |
| Defendants. | Honorable Percy Anderson |
| | Date: September 14, 2020 |
| | Time: 1:30 p.m. |
| | Courtroom: 9A |

/ / /

/ / /

/ / /

/ / /

/ / /

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

1

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

NOTICE IS HEREBY GIVEN THAT, on September 14, 2020, at 1:30 p.m. before the Honorable Percy Anderson, in Courtroom 9A of the United States District Court, Central District of California, Western Division, First Street Courthouse, 350 W. 1st Street, Los Angeles, California, Defendant California Regional Multiple Listing Service, Inc. ("CRMLS") will and hereby does move the Court to dismiss the First Amended Complaint (Dkt. No. 46) pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. This motion is made on the grounds that the First Amended Complaint ("FAC") fails to allege facts sufficient to establish antitrust injury or anticompetitive conduct, that CRMLS entered into an unlawful agreement or concerted action, and that CRMLS has market power within the relevant market.

This Motion is made following the conference of counsel pursuant to L. R. 7-3, which took place on July 10, 2020 and July 27, 2020.

This Motion is based on this Notice of Motion and Motion; accompanying Memorandum of Points and Authorities; the pleadings and papers filed in this action; and such further argument and matters as may be offered at the time of the hearing of this Motion.

Dated: August 13, 2020          STREAM KIM HICKS WRAGE & ALFARO PC


                                */s/ Robert J. Hicks*
                                _____
                                Robert J. Hicks
                                Theodore K. Stream
                                Andrea Rodriguez
                                Attorneys for Defendant,
                                CALIFORNIA REGIONAL MULTIPLE
                                LISTING SERVICE, INC.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

2
**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.  INTRODUCTION................................................................................1

II.  FACTUAL BACKGROUND...........................................................3

III.  LEGAL STANDARD ........................................................................5

IV.  ARGUMENTS ...................................................................................5

    A.  The FAC Fails to Allege an Antitrust Injury ..........................5

    B.  The FAC Fails to Establish that CRMLS Entered into an
        Agreement or Conspiracy ..........................................................9

        1.  The FAC does not contain factual allegations establishing
            that CRMLS entered into an unlawful agreement or
            concerted action with Bright MLS and MRED........................9

        2.  The FAC does not contain factual allegations establishing
            that CRMLS entered into an unlawful agreement or
            concerted action "between and among" its members...............13

    C.  The FAC Fails to Establish that CRLMS has Market Power
        Within the Relevant Market .....................................................16

        1.  The FAC's Definition of the Relevant Market Fails...............16

            a)  The FAC's definition of the relevant product
                market fails because it does not include both sides
                of a listing service, which is a two-sided platform ........17

            b)  The FAC's definition of the relevant geographic
                market also fails because the factual allegations do
                not support a national or regional market .....................20

        2.  The FAC Fails to Allege the Existence of Substantial
            Barriers to Entry for Purposes of Establishing CRMLS's
            Market Power...........................................................................21

    D.  The FAC Fails to Establish that the Policy has Anti-
        Competitive Effects..................................................................23

    E.  The FAC Should be Dismissed *Without* Leave to Amend .................24

V.  CONCLUSION.................................................................................24

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

1
**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

# TABLE OF AUTHORITIES

## Cases

*Am. Ad Management, Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051 (9th Cir. 1999)..................................................................................................6

*Bailey v. Allgas, Inc*., 284 F.3d 1237 (11th Cir. 2002)...............................21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...............5, 9, 14, 13, 15

*Bolinger v. First Multiple Listing Service, Inc.*, 838 F. Supp. 2d 1340, 1360-61 (N.D. Georgia 2012)........................................................................14

*County of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)..........5

*G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256 (1978) ...................................9

*Garnica v. HomeTeam Pest Defense, Inc.*, 230 F. Supp. 3d 1155 (N.D. Cal. 2017)..................................................................................................21

*Hahn v. Oregon Physicians' Service*, 868 F.2d 1022 (9th Cir. 1988)...................5, 8

*In re Citric Acid Litigation*, 191 F.3d 1090 (9th Cir. 1999).........................11

*In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015)..........................................................................11, 12

*In re TFT-LCD Antitrust Litigation*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008)..........14, 15

*Kendall v. Visa USA, Inc.*, 518 F.3d 1042 (9th Cir. 2008)..........................15

*Kline v. Coldwell, Banker & Co.*, 508 F.2d 226 (9th Cir. 1974).....................12, 14

*Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422 (9th Cir. 1993)..............21

*Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207 (9th Cir. 1977).....................20

*National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015).............24

*Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008)......16

*Nova Designs, Inc. v. Scuba Retailers Ass'n*, 202 F.3d 1088 (9th Cir. 2000) .........11

*Ohio v. American Express, Co.*, 138 S. Ct. 2274 (2018)..................8, 17, 18, 19, 23

*Oltz v. St. Peter's Community Hospital*, 861 F.2d 1440 (9th Cir. 1988).............9, 16

*Papasan v. Allain*, 478 U.S. 265 (1986)...................................................5

*Pool Water Products v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001) .....................7, 9

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

2

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

*Realcomp II, Ltd,* 635 F.3d at 828-29 ......................................................................19

*Rebel Oil Co., Inc. v. Atlantic Richfield Co*., 51 F.3d 1421
    (9th Cir. 1995) ............................................................................6, 16, 21

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001)..........................7

*Top Agent Network, Inc. v. National Association of Realtors*, No. 20-cv-
    03198-VC, 2020 WL 4013223 (N.D. Cal. July 16, 2020).........................8, 23

*United States v. Syufy Enterprises*, 903 F.2d 659 (9th Cir. 1990)..........................22

*Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003)..............................11

*Zoslaw v. MCA Distrib. Corp*., 693 F.2d 870, 885 (9th Cir. 1982)...................11, 13

**Statutes**

15 U.S.C. § 1 .........................................................................................................5, 9

Cal. Code Civ. Proc. § 425.16 ..................................................................................11

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This is a rare antitrust case where the allegedly wrongful conduct described in Plaintiff's First Amended Complaint ("FAC") actually stimulates competition and is beneficial to consumers, whereas the remedy sought by Plaintiff is anti-competitive and would be harmful to consumers.

Defendant California Regional Multiple Listing Service, Inc. ("CRMLS") operates a listing service for real estate professionals representing buyers and sellers of residential real estate in California. ("FAC", ¶ 18.) CRMLS is a member of the National Association of Realtors ("NAR"), which is a trade association that, among other things, implements rules and policies governing any multiple listing service (MLS) that is affiliated with NAR. (FAC, ¶¶ 17.) In November 2019, NAR voted to approve and adopt the Clear Cooperation Policy (the "Policy"), which requires a listing broker to submit a listing to the MLS within one business day of marketing a property to the public. (FAC, ¶¶ 86-89.) The Policy was effective on January 1, 2020, and as a NAR-affiliated MLS, CRMLS was obligated to adopt and implement the Policy. (FAC, ¶ 90.)

Plaintiff The PLS.com, LLC ("PLS") operates an MLS that was purportedly formed to address the skyrocketing demand for "pocket listings," which are "listings marketed by real estate professionals outside of the NAR affiliated system." (FAC, ¶¶ 7, 8, 16, 58.) The FAC alleges that real estate professionals often belong to a NAR-affiliated MLS in order to access the broad range of listings on that MLS, while simultaneously participating in other listings services, like PLS, in order to market certain pocket listings to an exclusive subset of consumers outside of the NAR-affiliated MLS system. (FAC, ¶¶ 31, 32, 58-61.)

The Policy simply ensures that any agent benefitting from the contributions of others to an MLS is under a reciprocal obligation to contribute their own listings

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

1

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

to that same MLS.  This allows agents (and the consumers they represent) to ensure that their property is being marketed as widely as possible (for sellers) while also having equal access to a broad array of listings (for buyers).  The Policy prevents agents that participate in a NAR-affiliated MLS from restricting agent and consumer access to certain listings that those agents want to market outside the NAR-affiliated MLS system to an exclusive subset of agents and consumers.

Despite the Policy's obvious benefits to consumers, PLS argues that the Policy has anticompetitive effects because it eliminates the incentive for real estate professionals to use PLS's private listing service.  But even if this were true, this does not amount to harm to *competition*; it simply represents harm to a *competitor*. Moreover, it ignores the fact that the Policy does nothing to prevent agents from using PLS for their listings; it simply requires those agents to also submit the listing to CRMLS if they want to be able to participate in CRMLS.  And agents are free to exclusively use PLS if they do not want to abide by CRMLS's rules for participation.

Ultimately, the Policy is simply preventing agents from "having their cake and eating it too."  It prevents agents from making use of the benefits of an MLS without the reciprocal obligation to contribute to that same MLS.  The MLS ceases to serve its intended purpose for buyers (and their agents) looking for properties to purchase if sellers are refraining from listing their properties on the MLS.  The Policy is simply saying that agents cannot have it both ways—if they want to participate in the MLS, they must be willing to comply with the obligations of the MLS by contributing their own listings in order to benefit from the contributions of others.  Because an MLS is a two-sided platform, the Policy ensures that one side of the platform is not being exploited at the expense of the other side of the platform.

Moreover, even assuming *arguendo* that the Policy is anti-competitive (it is not), there is simply no reason for CRMLS to be named in this lawsuit.  The FAC

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

2

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

fails to allege how CRMLS entered into any unlawful agreement, concerted action, or conspiracy related to the Policy.  The factual allegations in the FAC establish that all CRMLS did was: (1) sign an industry white paper that generally discussed pocket listings; and (2) attend a trade association conference where the Policy was discussed.  And then CRMLS adopted the Policy as it was *required* to do under NAR's rules governing CRMLS.  But membership and participation in a trade association is certainly not enough to establish liability for treble damages for Sherman Act and Cartwright Act violations.[1]  CRMLS did nothing unlawful.  It simply participated in a trade association and exercised its constitutional right to free speech on an issue of public interest.  PLS cannot hold CRMLS liable for this constitutionally protected activity.

Because the FAC fails to demonstrate that the Policy is anticompetitive or causes an antitrust injury, the FAC is fundamentally flawed.  Moreover, the FAC fails to contain plausible factual allegations regarding how CRMLS purportedly entered into an illegal agreement or concerted action with the other defendants or amongst its members.  Finally, the FAC fails to establish that CRMLS has market power within the relevant market because the market definition is facially unsustainable and the FAC does not establish any substantial barriers to entry within that market.  Because the FAC fails to state a claim upon which relief can be granted, the FAC must be dismissed without leave to amend.

## II.

## FACTUAL BACKGROUND

As admitted in the FAC, a multiple listing service ("MLS") is an electronic database of real estate listings submitted by members of the MLS that is made available to other members of the MLS.  (FAC, ¶¶ 32, 59-60.)  Through an MLS, a licensed real estate professional representing a seller "can market properties to a large set of potential buyers," and "a licensed real estate professional representing

---

[1] *See infra* section IV(B)(1) for a detailed discussion on the case law on this issue.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

28

3

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

a buyer can provide that buyer with information about all the listed homes in the area that match that buyer's housing needs." (FAC, ¶ 32.)  In order to be a member and obtain the benefits of participation in an MLS, "a licensed real estate professional must adhere to any restrictions that the MLS imposes." (FAC, ¶ 32.)

The FAC recognizes that some MLSs are affiliated with NAR, including Defendants CRMLS and Bright MLS, while others are not affiliated with NAR, including Defendant MRED and Plaintiff PLS.  (FAC, ¶¶ 18-20, 58.)  Those MLSs that are affiliated with NAR must adhere to "the mandatory provisions in NAR's Handbook on Multiple Listing Policy." (FAC, ¶ 33.)  The FAC does not state that there is any requirement for licensed real estate professionals to be a member of NAR or to participate in a NAR-affiliated MLS.  To the contrary, according to the FAC, both MRED and PLS have a large membership despite not being affiliated with NAR, and the FAC alleges that in some markets, "20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system." (FAC, ¶¶ 7, 12, 20, 65, 66.)  Moreover, licensed real estate professionals can be members of more than one MLS.  (FAC, ¶¶ 46.)

The FAC alleges that on or around November 10, 2019 at a meeting in San Francisco, NAR approved the Clear Cooperation Policy (the "Policy"), which requires a listing broker to "submit the listing to the MLS for cooperation with other MLS participants" within one business day of marketing a property to the public.  (FAC, ¶¶ 86, 87, 89.)  The Policy has an exception for "office listings" that are marketed within a brokerage firm.  (FAC, ¶ 93.)

The Policy became effective on January 1, 2020 and was included as a mandatory rule in the 2020 version of the NAR Handbook on Multiple Listing Policy.  (FAC, ¶ 90.)  As a NAR-affiliated MLS, CRMLS was required to adopt the Policy by May 1, 2020.  (FAC, ¶ 90.)

/ / /

/ / /

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

4
**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

### III.

### LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a party may assert by motion that a complaint has failed to state a claim upon which relief can be granted.  To survive a motion to dismiss, a complaint must allege enough facts to state a claim to relief that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In analyzing a plaintiff's claims, a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Courts require "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

### IV.

### ARGUMENTS

The FAC alleges claims against CRMLS for monetary damages and injunctive relief for violation of the Sherman Act and the Cartwright Act.  (FAC, ¶¶ 123-128.)  Pursuant to 15 U.S.C. § 1 (hereinafter "Section 1"), "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."

"To establish a section 1 violation, [a plaintiff] must show three elements: (1) an agreement or conspiracy, (2) resulting in an unreasonable restraint of trade, and (3) causing antitrust injury."  *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1026 (9th Cir. 1988).  Because the Cartwright Act was modeled after the Sherman Act, the analysis under California's antitrust law mirrors the analysis under federal law.  *County of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

### A.    The FAC Fails to Allege an Antitrust Injury

In order to establish standing to bring an antitrust action, the plaintiff must show antitrust injury, which is "injury of the type the antitrust laws were intended

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

5

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

to prevent and that flows from that which makes defendants' acts unlawful." *Am. Ad Management, Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). The Ninth Circuit has recognized that "[t]he antitrust laws do not provide a remedy to every party injured by unlawful economic conduct." *Id*. "It is well established that **the antitrust laws are only intended to preserve competition <u>for the benefit of consumers</u>**." *Id*. (emphasis added).

To show an antitrust injury, the loss must "flow[] from an anticompetitive aspect or effect of the defendant's behavior, since it is inimical to the antitrust laws to award damages for losses stemming from acts that do not hurt competition." *Rebel Oil Co., Inc. v. Atlantic Richfield Co*., 51 F.3d 1421, 1433 (9th Cir. 1995). "**If the injury flows from aspects of the defendant's conduct that are beneficial or neutral to competition, there is no antitrust injury**, even if the defendant's conduct is illegal *per se*." *Id*. (emphasis added).

Here, the FAC alleges that PLS suffered injury from the adoption of the Policy because "[l]istings were removed from PLS and submitted instead to NAR-affiliated MLSs," "[a]gent participation in PLS declined," "PLS's access to capital was constrained," and "PLS was foreclosed from the commercial opportunities necessary to innovate and grow." (FAC, ¶ 121.)

But these alleged injuries described in the FAC constitute harm to a *competitor*, not harm to *competition*. "Of course, conduct that eliminates rivals reduces competition. **But reduction of competition does not invoke the Sherman Act until it harms <u>consumer welfare</u>**." *Rebel Oil Co*., 51 F.3d at 1433 (emphasis added). Thus, "an act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the price of goods above competitive levels or diminishes their quality." *Id*.

Here, the FAC does not describe how PLS's alleged injury flows from an anticompetitive aspect or effect of CRMLS's behavior, nor does the FAC explain how adoption and implementation of the Policy harms consumer welfare in the

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

6

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1    form of reduced output, increased prices, or reduced quality.  Even if listings were
2    removed from PLS and submitted to CRMLS, the Ninth Circuit has found that "[a]
3    decrease in one competitor's market share, however, affects competitors, not
4    competition."  *Pool Water Products v. Olin Corp*., 258 F.3d 1024, 1036 (9th Cir.
5    2001).  Thus, in *Pool*, the Ninth Circuit found that shifting the plaintiff's sales to
6    the defendants and other competitors "does not directly affect consumers and
7    therefore does not result in antitrust injury." *Id*.

8          The FAC generally alleges that the Policy "maintained the cost of listing
9    network services . . . above a competitive level" and  "[t]he Defendants' conduct
10   simultaneously harmed PLS and consumers in the relevant market by excluding
11   PLS and thereby artificially maintaining or increasing prices paid by licensed real
12   estate professionals for listing network services . . . ."  (FAC, ¶¶ 114, 122.)  But
13   these conclusory allegations do not show how consumers are actually harmed by
14   adoption of the Policy or how the Policy maintains the cost of listing network
15   services above a competitive level.  The mere assertion that the Defendants'
16   conduct caused higher prices, without pleading specific facts to support this
17   conclusory allegation, is insufficient to satisfy federal pleading standards.  It is
18   well-established that courts are not required to "accept as true allegations that are
19   merely conclusory, unwarranted deductions of fact, or unreasonable inferences."
20   *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

21         Moreover, according to the allegations in the complaint, the purported
22   "higher prices" are paid by "licensed real estate professionals," not by the ultimate
23   consumer.  (FAC, ¶ 122.)  Therefore, it remains unclear exactly how *consumers* are
24   purportedly harmed by CRMLS's conduct.  To the extent there is "consumer
25   demand" for pocket listings and for alternatives to NAR-affiliated MLSs—as the
26   FAC repeatedly alleges—the FAC fails to establish how CRMLS's adoption of the
27   Policy prevents this demand from being met.  (FAC, ¶¶ 7-9, 31, 52, 92, 115.)
28   Sellers that do not want to list their property on a NAR-affiliated MLS have

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

7

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

several options at their disposal—including marketing the property between agents who work within the same brokerage firm (which is permitted under the Policy's exception for "office listings") or by using an agent that is not a member of a NAR-affiliated MLS and thus is not subject to the Policy.  (FAC, ¶ 90, 93.)

Notably, the Northern District of California recently had the opportunity to consider the purported anticompetitive effects of the Clear Cooperation Policy in *Top Agent Network, Inc. v. National Association of Realtors*, No. 20-cv-03198-VC, 2020 WL 4013223 (N.D. Cal. July 16, 2020).  In denying the plaintiff's motion for a preliminary injunction, the court noted that "members of Top Agent Network are free to join any NAR listing service and enjoy its benefits, and they are free to withdraw if they do not like the policies.  <u>Antitrust law does not give them a right to benefit from the contributions of fellow NAR members while withholding listings of their own</u>."  *Id*. at *1, citing *Hahn,* 868 F.2d at 1030 (emphasis added). The court further stated,

> Antitrust law distinguishes between 'restraints with anticompetitive effect that are harmful to consumers and restraints stimulating competition that are in the consumer's best interest.'  *Ohio v. American Express, Co*., 138 S. Ct. 2274, 2284 (2018).  Top Agent Network's theories for how the policy hurts buyers and sellers are dubious.  **It is far more likely that the policy benefits buyers and sellers by increasing access to information about the housing market, thus increasing market efficiency and stimulating competition**.  *Top Agent Network*, 2020 WL 4013223 at *1 (emphasis added).

Ultimately, the allegations in the FAC demonstrate that the Policy does not harm consumer welfare; to the contrary, it is beneficial to competition.[2]  "The critical question for determining whether there is antitrust injury is whether the

---

[2] In fact, it is the remedy sought by PLS—elimination of the Policy—that is anti-competitive.  As admitted by PLS, it wants to enable agents to selectively choose which listings to refrain from broadly marketing on the public MLS in favor of listing it on PLS to an exclusive subset of consumers. (FAC, ¶¶ 6, 8, 60-62.)  Not only does this harm consumer welfare, it can lead to ethical violations by brokers and can arguably cause violations of fair housing laws.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

28

8

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1  harm is of the kind the antitrust laws were meant to protect against."  *Pool*, 258

2  F.3d at 1036.  And here, PLS has failed to make this threshold showing.

3  **B.      The FAC Fails to Establish that CRMLS Entered into an**

4  **         Agreement or Conspiracy**

5          The first element that a Section 1 claimant must plead is "an agreement or

6  conspiracy among two or more persons or distinct business entities."  *Oltz v. St.*

7  *Peter's Community Hospital*, 861 F.2d 1440, 1445 (9th Cir. 1988).  "Because § 1 of

8  the Sherman Act does not prohibit all unreasonable restraints of trade . . . but only

9  restraints effected by a contract, combination, or conspiracy, **the crucial question**

10 **is whether the challenged anticompetitive conduct stems from independent**

11 **decision or from an agreement, tacit or express**."  *Twombly*, 550 U.S. at 553

12 (emphasis added).  The Supreme Court held that "stating such a claim [under 15

13 U.S.C. § 1] requires a complaint with enough factual matter (taken as true) to

14 suggest that an agreement was made."[3]  *Id*. at 556.  "An allegation of parallel

15 conduct and a bare assertion of conspiracy will not suffice."  *Id*.  Moreover, "a

16 conclusory allegation of agreement at some unidentified point does not supply

17 facts adequate to show illegality."  *Id*. at 557.

18         The FAC alleges that the adoption and enforcement of the Policy is the

19 product of "agreements and concerted action (i) among the MLS Defendants and

20 (ii) between and among each NAR-affiliated MLS and their members."  (FAC, ¶

21 104.)   But none of these alleged agreements satisfy the *Twombly* pleading

22 standards as to CRMLS.

23     **1.      The FAC does not contain factual allegations establishing**

24 **              that CRMLS entered into an unlawful agreement or**

25 **              concerted action with Bright MLS and MRED**

26         The first alleged unlawful agreement is purportedly between CRMLS and

27

28 [3] A comparable standard applies to Cartwright Act claims under California law.  *G.H.I.I.*
   *v. MTS, Inc*., 147 Cal. App. 3d 256, 265-66 (1978).

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

9

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

the other MLS Defendants—Bright MLS and MRED.[4]  (FAC, ¶¶ 104, 105.)  But other than conclusory allegations, the FAC does not allege *facts* explaining how CRMLS entered into such an agreement with Bright MLS and MRED.

According to the FAC, CRMLS's purported involvement in adoption of the Policy is as follows.

- In September 2019, CRMLS was purportedly one of several signatories to a white paper that "called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings." (FAC, ¶ 75.)  There is no allegation that the Policy was specifically discussed in the white paper.

- On October 17-18, 2019, CRMLS attended a Council of Multiple Listing Services ("CMLS") conference in Salt Lake City, Utah during which there were discussions about "the competitive threat presented by pocket listings and the need for NAR to take action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy."  (FAC, ¶ 78.)

- The Policy was included as a mandatory rule in NAR's 2020 Handbook on Multiple Listing Policy; therefore, as a NAR-affiliated MLS, CRMLS was required to modify its rules to conform to the Policy by May 1, 2020. (FAC, ¶ 90.)

Ultimately, CRMLS's only alleged involvement in the adoption of the Policy was: (1) signing an industry white paper that generally discussed pocket listings and did not specifically mention the Policy or PLS; (2) attending a trade-association conference during which the Policy was discussed; and (3) adopting the Policy as mandated by NAR's rules.  (FAC, ¶¶ 75, 78, 90.)  There is no specific allegation that CRMLS was involved in formulating, advocating for, or approving the Policy.  Notably, PLS alleges that a NAR committee initially voted to recommend the adoption of "what would become" the Policy in August 2019, and

---

[4] The FAC alleges in paragraph 104 that the agreement and concerted action was "among the MLS Defendants," and the term "MLS Defendants" is defined in paragraph 25 as "CRMLS, Bright MLS, and MRED."  (FAC, ¶¶ 25, 104.)

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

C1244/001 - 246655.1

1   then the NAR Board of Directors approved the adoption of the Policy at a meeting
2   in San Francisco on November 9-11, 2019.  (FAC, ¶¶ 71, 86-88.)  PLS fails to
3   allege that CRMLS was even present at the August 2019 or November 2019
4   meetings.  And to the extent PLS is seeking to impose liability on CRMLS for
5   signing a white paper and/or attending a trade association conference, this is an
6   infringement on CRMLS's constitutional right of petition and free speech in
7   connection with an issue of public interest.  *See Vess v. Ciba-Geigy Corp. USA*,
8   317 F.3d 1097, 1110 (9th Cir. 2003); *see also* Cal. Code Civ. Proc. § 425.16.

9        Moreover, there are no facts establishing that CRMLS entered into any
10  agreement or concerted action with Bright or MRED related to the Policy.  It is
11  unclear from the FAC just *what* the alleged unlawful agreement is "among the
12  MLS Defendants."  (FAC, ¶ 104.)  It is well-established that "membership in a
13  trade association alone is not proof of an agreement." *Nova Designs, Inc. v. Scuba*
14  *Retailers Ass'n*, 202 F.3d 1088, 1092 (9th Cir. 2000).   Further, "**mere**
15  **participation in trade-organization meetings where information is exchanged**
16  **and strategies are advocated <u>does not suggest an illegal agreement</u>**." *In re*
17  *Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir.
18  2015) (emphasis added); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870,
19  885 (9th Cir. 1982) ("[I]n the absence of any indication of agreement or consent to
20  an illegal arrangement, evidence of industry meetings is not sufficient to prove a
21  conspiracy").  The Ninth Circuit has noted that "[i]f we allowed conspiracy to be
22  inferred from such activities alone, we would have to allow an inference of
23  conspiracy whenever a trade association took almost any action." *In re Citric Acid*
24  *Litigation*, 191 F.3d 1090, 1098 (9th Cir. 1999).

25       The conduct alleged in the FAC related to CRMLS merely constitutes
26  membership  and  participation  in  a  trade  association  where  information  is
27  exchanged and strategies are discussed related to industry-wide issues, like pocket
28  listings.  Attending a conference and signing a white paper certainly cannot be

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

11

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

sufficient to impose liability under Section 1 of the Sherman Act for treble damages. *See Kline v. Coldwell, Banker & Co*., 508 F.2d 226, 232 (9th Cir. 1974) ("It thus clearly appears that in order for a member of a trade association to become . . . liable in a treble damages case he must have knowingly, intentionally and actively participated in an individual capacity in the scheme.").

Further belying the notion that CRMLS entered into an unlawful agreement with MRED and Bright is the fact that all three MLSs adopted different versions of the Policy at different times and in different ways. In fact, the FAC does not even allege that MRED adopted the Policy, or anything similar, at all. MRED is not even affiliated with NAR and thus had no obligation under NAR's rules to adopt the Policy. (FAC, ¶¶ 20, 90.) And Bright adopted "a version of what would become the Clear Cooperation Policy" on October 16, 2019 "before having any obligation under the NAR rules or otherwise to do so." (FAC, ¶ 76.) Notably, this was *before* the October 17-18, 2019 CMLS conference attended by CRMLS and *before* NAR's approval and adoption of the Policy at a meeting in San Francisco in November 2019. (FAC, ¶¶ 78, 86-88.) As far as CRMLS, it did not adopt the Policy until it was required to do so under NAR's 2020 Handbook on Multiple Listing Policy, which was after the October 2019 CMLS conference and after the Policy was adopted by NAR at the November 2019 San Francisco meeting. (FAC, ¶¶ 78, 86, 90.)

The FAC does not identify any specific meeting or agreement that constitutes the concerted action between CRMLS, Bright, and MRED. Moreover, the notion of a concerted action between these defendants is simply not plausible in light of the FAC's allegations demonstrating that the parties adopted different policies at different times. Simultaneous adoption of similar policies across an industry "does not reveal anything more than similar reaction to similar pressures within an interdependent market" and is not sufficient to establish collusion. *In re Musical Instruments,* 798 F.3d at 1196. Even if a plaintiff could demonstrate

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

C1244/001 - 246655.1

parallel conduct among alleged co-conspirators, "the courts also require that the plaintiff demonstrate that the allegedly parallel acts were against each conspirator's self interest, that is, that the decision to act was not based on a good faith business judgment." *Zoslaw,* 693 F.2d at 884.  As the Supreme Court stated in *Twombly*, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

Ultimately, the conduct on the part of CRMLS described in the FAC amounts to nothing more than membership and participation in a trade association and adoption of similar policies at different times than MRED and Bright—as CRMLS was required to do by NAR rules.  Thus, the FAC falls far short of the *Twombly* pleading standard requiring non-conclusory, plausible allegations of an unlawful agreement "among the MLS Defendants."

### 2. The FAC does not contain factual allegations establishing that CRMLS entered into an unlawful agreement or concerted action "between and among" its members

PLS's allegations of a conspiracy discussed above relate to an ***external*** agreement or conspiracy among MRED, Bright, and CRMLS.  In addition,  PLS includes  far  more  sparse  allegations  of  an  ***internal***  or  intra-entity conspiracy "between and among each NAR-affiliated MLS and its members." (FAC, ¶ 104.)

PLS describes the purported internal conspiracy as follows:  "Each NAR-affiliated MLS is owned and controlled by associations of competing real estate brokers, who collectively have the power to admit new members, propose bylaws, and enact rules for members.  The NAR-affiliated MLSs' rules are an agreement among competitors that define the way in which they will compete with one another."  (FAC, ¶ 104.)  Thus, the purported conspiracy is "between and among"

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1   CRMLS and its members.

2       As set forth by the Supreme Court, stating a claim under Section 1 of the
3   Sherman Act "requires a complaint with enough ***factual matter*** (taken as true) to
4   suggest that an agreement was made," and "a conclusory allegation of agreement at
5   some unidentified point does not supply facts adequate to show illegality."
6   *Twombly,* 550 U.S. at 556-57 (emphasis added). Moreover, adoption of a rule or
7   policy by a MLS is not, in and of itself, sufficient to establish a concerted action
8   between the members of the MLS. *See, e.g., Bolinger v. First Multiple Listing*
9   *Service, Inc*., 838 F. Supp. 2d 1340, 1360-61 (N.D. Georgia 2012) (finding that
10  complaint failed to make a plausible showing that the rules of a MLS were
11  sufficient to establish an unlawful agreement amongst the members of the MLS).
12  PLS's conclusory allegations and bare assertions of conspiracy do not meet the
13  requisite pleading standard.

14      First, PLS repeatedly alleges that NAR mandated that each NAR-affiliated
15  MLS had to adopt the Policy. (FAC, ¶¶ 18, 35-37, 90.) It is unclear how the
16  members of a particular NAR-affiliated MLS could conspire with their MLS to
17  adopt a policy the MLS had no choice but to adopt. In fact, each member's
18  opinions regarding the Policy, pro or con, were irrelevant and could not give rise to
19  a conspiracy. There is simply no allegation that CRMLS or its members acted with
20  any sort of intent in adopting the Policy; instead each MLS simply complied with
21  NAR's rule obligating the MLS to adopt and implement the Policy by a certain
22  date. *See Kline*, 508 F.2d at 232 (to be liable for treble damages, alleged co-
23  conspirator must have "knowingly, <u>intentionally</u>, and actively participated in an
24  individual capacity in the scheme"); *see also In re TFT-LCD Antitrust Litigation*,
25  586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[A]t the heart of an antitrust
26  conspiracy is an agreement and a <u>conscious decision</u> by each defendant to join it.")
27  (emphasis added). Complying with a national trade association's mandatory rules
28  certainly cannot be sufficient to establish any sort of unlawful agreement amongst

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

14
**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1    CRMLS's members.

2         Second, PLS fails to allege any specific facts regarding who from CRMLS,

3    or any MLS, was involved in this conspiracy.  Presumably, PLS could claim every

4    member of every NAR-affiliated MLS across the nation is liable for treble

5    damages under the Sherman Act based on these incredibly vague, conclusory

6    allegations, which do not demonstrate how there was any sort of unlawful

7    agreement "between and among" CRMLS's members.  *Kendall v. Visa USA, Inc.*,

8    518 F.3d 1042, 1048 (9th Cir. 2008) (complaint alleging conspiracy in restraint of

9    trade must answer "the basic questions: who, did what, to whom (or with whom),

10   where, and when?")

11        Third, to support this theory PLS alleges that each "NAR-affliated MLS is

12   owned and controlled by associations of competing real estate brokers," and the

13   "NAR affiliated MLSs' rules are an agreement between these competitors that

14   define the way in which they will compete with one another."   FAC ¶ 104.

15   However, these allegations are misplaced because the Policy does not restrict

16   competition *between brokers*, it allegedly harms another non-NAR affiliated listing

17   service—PLS.  Thus, the allegations make no sense because this is not a lawsuit

18   brought by competing real estate brokers against CRMLS.

19        In summary, at a minimum, *Twombly* requires that the FAC allege sufficient

20   factual matter indicating that an illegal agreement was made between CRMLS's

21   members in order to give CRMLS fair notice of the grounds for the claim it is

22   defending against.   *Twombly*, 550 U.S. at 556-57.   The FAC's general and

23   conclusory allegations in paragraph 104 regarding how "NAR-affiliated MLSs"

24   generally operate and how they purportedly conspired to formulate and adopt the

25   Policy is not sufficient to satisfy *Twombly's* pleading standards.  *See In re TFT-*

26   *LCD Antitrust Litig.*, 586 F. Supp. 2d at 1117 (general allegations as to all

27   defendants or categories of defendants is "insufficient to put specific defendants on

28   notice of the claims against them").   Therefore, because the FAC has failed to

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

15

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1  establish that CRMLS engaged in an internal conspiracy, the FAC must be
2  dismissed.

3  **C.    The FAC Fails to Establish that CRLMS has Market Power**
4  **         Within the Relevant Market**

5      "In order to state a valid claim under the Sherman Act, a plaintiff must
6  allege that the defendant has market power within a 'relevant market.'  That is, the
7  plaintiff must allege both that a 'relevant market' exists and that the defendant has
8  power within that market."  *Newcal Industries, Inc. v. Ikon Office Solution*, 513
9  F.3d 1038, 1044 (9th Cir. 2008).

10     "Market power may be demonstrated through either of two types of proof."
11 *Rebel Oil*, 51 F.3d at 1434.  One type is direct evidence of the injurious exercise of
12 market power, which includes "evidence of restricted output and supracompetitive
13 prices."    *Id*.    The second, more common type, is "circumstantial evidence
14 pertaining to the structure of the market."    *Id*.    "To demonstrate market power
15 circumstantially, a plaintiff must (1) define the relevant market, (2) show that the
16 defendant owns a dominant share of that market, and (3) show that there are
17 significant barriers to entry and show that existing competitors lack the capacity to
18 increase their output in the short run."  *Id*.

19     Here, the FAC's definition of the relevant market is facially unsustainable
20 and the FAC fails to demonstrate that there are significant barriers to entry into that
21 market.

22     **1.    The FAC's Definition of the Relevant Market Fails**

23     "The term 'relevant market' encompasses notions of geography as well as
24 product use, quality, and description."  *Oltz,* 861 F.2d at 144.  "[A] complaint may
25 be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is
26 facially unsustainable."  *Newcal Industries*, 513 F.3d at 1045.

27     The FAC's definition of the relevant market fails as to both the description
28 of the services and the geographic description.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

16

**MOTION TO DISMISS FIRST AMENDED COMPLAINT**
**PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

a)   **The FAC's definition of the relevant product market fails because it does not include both sides of a listing service, which is a two-sided platform**

The Supreme Court has held that both sides of a two-sided platform must be included when defining the relevant product market. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018).   In coming to this conclusion, the Supreme Court recognized that "two-sided platforms often exhibit what economists call 'indirect network effects.'"   *Id*. at 2280.   "**Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate**.   In other words, the value of the services that a two-sided platform provides increase as the number of participants on both sides of the platform increases." *Id*. at 2280-81 (emphasis added).

In *Amex*, the court found that credit-card networks are two-sided platforms; therefore, "courts must include both sides of the platform—merchants and cardholders—when defining the credit-card market."   *Id*. at 2286.   The court further found that "[e]valuating both sides of a two-sided transaction platform is also necessary to accurately assess competition." *Id*. at 2287. "Thus, **competition cannot be accurately assessed by looking at only one side of the platform in isolation**." *Id*. (emphasis added).)

Here, a listing service is a classic example of a two-sided platform where "the value . . . to one group of participants depends on how many members of a different group participate." *Id*. at 2280-81.   The FAC admits that a listing service offers value to: (1) buyers (and agents representing buyers) in search of a property to purchase; and (2) sellers (and agents representing sellers) listing a property for sale.   Specifically, the FAC alleges: "By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers.  By searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

17
**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

housing needs."[5]  (FAC, ¶ 32.)

Despite admitting in the FAC that there are two-sides to a listing service, PLS focuses only on the seller's side of the platform in defining the relevant product market.  Specifically, the FAC defines the relevant market as "[t]he provision of listing network services to licensed real estate professionals for the sale of residential real estate listings."  (FAC, ¶ 98.)  According to the FAC, "[c]onsumers of listing network services for the sale of the residential real estate listings view these networks, including the NAR-affiliated MLSs, MRED, and PLS, as substitutes for each other."  (FAC, ¶ 98.)

But defining the relevant market by only looking at one side of a two-sided platform is in direct contravention of the rule established in *Amex*.  The FAC attempts to avoid the *Amex* holding by alleging that "[l]isting network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate.  No transaction between buyers and sellers occurs on these networks."  (FAC, ¶ 99.)  But there is no requirement that there be a simultaneous transaction between buyers and sellers for a listing service to be a two-sided platform.  The court in *Amex* recognized that "a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."  *Id.* at 2280.  The key feature of a two-sided platform identified by the court in *Amex* is the fact that they exhibit "indirect network effects" wherein "the value to one group of participants depends on how many members of a different group participate."  *Id.*

The FAC alleges that "[a]ccess to the listing network gives real estate agents the ability to **list properties for sale _or_ view available properties for sale**," which recognizes that the platform offers services to two different groups—agents (and the sellers they represent) listing a property for sale and agents (and the

---

[5] The FAC also admits that: "Like the NAR-affiliated MLSs, PLS operates an electronic database of listings submitted by PLS members with an offer of compensation to other PLS members that can find a buyer."  (FAC, ¶ 60.)

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

C1244/001 - 246655.1

buyers they represent) viewing available properties for sale.  (FAC, ¶ 99 (emphasis added).)    The FAC recognizes—and PLS cannot reasonably dispute—that a decrease in participation on one side of the platform (i.e., sellers) would have "indirect network effects" on the other side of the platform (i.e. buyers).  As the Sixth Circuit has recognized, "[t]he value of an MLS to home sellers (or their representatives) increases with the number of home buyers (or their representatives) using the site, and similarly, the value to home buyers increases as more home sellers list their properties on the MLS."  *Realcomp II, Ltd,* 635 F.3d at 828-29.  And as alleged in PLS's own FAC, "MLSs, like other networks, exhibit what economists call 'network externalities,' meaning **the value of the network services is a function of the number of <u>trading partners</u> connected by the network**."  (FAC, ¶ 50 (emphasis added).)

Even if the ultimate transaction between buyers and sellers does not occur on the MLS (as PLS alleges in its FAC), that does not change the fact that *the MLS serves to connect those buyers and sellers*, which means that the value to one side of the platform is affected by participation on the other side.  And the value of the services provided by a two-sided platform "increases as the number of participants on both sides of the platform increases."  *Amex*, 138 S.Ct. at 2281.  The FAC's description of the "network externalities" exhibited by an MLS is the very same concept described by the court in *Amex* as the "indirect network effects" of a two-sided platform.

Because listing services are a two-sided platform, the relevant market cannot be defined without including both sides of the platform.  And the anti-competitive effect of CRMLS's adoption and implementation of the Policy cannot be adequately assessed without looking at both sides of the platform.  Therefore, because the FAC's definition of the relevant product market focuses on only one side of a two-sided platform, it is facially unsustainable.

/ / /

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

19

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**b)** **The FAC's definition of the relevant geographic market also fails because the factual allegations do not support a national or regional market**

"The relevant geographic market is the 'area of effective competition' defined in terms of where buyers can turn for alternative sources of supply." *Moore v. Jas. H. Matthews & Co.*, 550 F.2d 1207, 1218 (9th Cir. 1977).

The FAC alleges that "[o]ne relevant geographic market is nationwide," or "[i]n the alternative, each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Defendant, is a relevant geographic market." (FAC, ¶ 100.)  But to the extent the relevant market is nationwide, such a definition is facially unsustainable because the MLS Defendants do not compete with each other in the same geographic area.  To the contrary, the FAC admits that CRMLS, Bright, and MRED operate in separate geographic regions,[6] and their services could not reasonably be considered as alternatives for each other.  (FAC, ¶¶ 18-20.)  Residential real estate is inherently local, and consumers are generally focused on a specific geographic area when using a listing service to search for a home; they are not searching nationally for a property that fits their needs.

The purported nationwide market definition is also contradicted by the FAC's allegations regarding CRMLS's purported market share, which is allegedly 65-70 percent in California where it operates.  (FAC, ¶¶ 18, 100.)  But the FAC does not contain any factual allegations regarding CRLMS's purported market share within a nationwide market.  If the relevant market were defined nationally, CRMLS's market share would be minimal.

To the extent the relevant geographic market is defined as "each and every service area of a NAR-affiliated MLS, as well as the service areas of each MLS Defendant," courts have held that "a geographic market cannot be drawn simply to

---

[6] CRMLS operates in California, Bright operates in the Mid-Atlantic region of the United States, and MRED serves northern Illinois, southern Wisconsin, and northwest Indiana.  (FAC, ¶¶ 18-20.)

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

20

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

coincide with the market area of a specific company." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002); *see also Garnica v. HomeTeam Pest Defense, Inc.*, 230 F. Supp. 3d 1155, 1159 (N.D. Cal. 2017). Thus, the FAC's definition of the relevant geographic market is facially unsustainable.

### 2.     The FAC Fails to Allege the Existence of Substantial Barriers to Entry for Purposes of Establishing CRMLS's Market Power

The FAC also fails to establish that CRMLS owns a dominant share of the relevant market—either defined nationally or regionally—and that there are significant barriers to entry. *Rebel Oil*, 51 F.3d at 1434. "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.'" *Id*. at 1439, quoting *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1427-28 (9th Cir. 1993).

The FAC alleges that the "Defendants collectively have substantial market power," and based on this purported market power, the Defendants allegedly "have the power to profitably elevate the prices paid by licensed real estate professionals for access to listing network services above the competitive level, and to impose onerous conditions of access on licensed real estate professionals, including the Clear Cooperation Policy." (FAC, ¶ 101.)

But the FAC does not explain how CRMLS has market power within the relevant market. The FAC alleges that CRMLS's members "have access to more than 70 percent of listings for sale in California," and also generally alleges "on information and belief" that "each of the MLS Defendants has enjoyed a durably high share of over 65 percent of residential real estate listings" within their respective service areas. (FAC, ¶¶ 18, 100.) But this alone does not establish that CRMLS has market power, particularly because properties can be listed on more than one MLS at a time.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

21
**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

Moreover, a high market share, in and of itself, is not sufficient to establish market power absent the existence of barriers to entry. "If there are no significant barriers to entry, however, eliminating competitors will not enable the survivors to reap a monopoly profit; any attempt to raise prices above the competitive level will lure into the market new competitors able and willing to offer their commercial goods or personal services for less." *United States v. Syufy Enterprises*, 903 F.2d 659, 664 (9th Cir. 1990). "**A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers** or other evidence of a defendant's inability to control prices or exclude competitors." *Id*. (emphasis added).

Here, the FAC generally alleges that "[s]ubstantial barriers to entry exist to protect that market power," but the only specific barrier to entry identified in the FAC "are the network effects that accrue to the NAR-affiliated MLSs as a result of their large market shares." (FAC, ¶ 101.) But this is essentially circular reasoning—using a high market share to prove that barriers to entry exist without actually identifying a specific barrier to entry other than the high market share. This is in direct contravention to the rule stated in the *Syufy Enterprises* case.

The FAC does not identify any barriers to entry that would prevent a new competitor from entering the market or an existing competitor from expanding its output to challenge the allegedly "elevated prices" and "onerous conditions" of access imposed by CRMLS. (FAC, ¶ 101.) As has already been discussed, there is nothing preventing agents from listing properties on both CRMLS and other listing services, including PLS, in order to maximize exposure of the property. And if anything, the purported "high fees" and "onerous conditions" imposed by CRMLS should "lure into the market new competitors able and willing to offer their services for less," as recognized by the court in *Syufy Enterprises*. *Id*. at 664.

PLS cannot have it both ways. On the one hand, it argues that the demand for pocket listings has "skyrocketed" and is as high as 20 percent in some markets,

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

22

**MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)**

including Los Angeles and San Francisco, which both fall within CRMLS's service area.  (FAC, ¶ 7.)  But on the other hand, it argues that a rule that *applies only to NAR-affiliated MLSs* serves to effectively shut PLS out of the market.  (FAC, ¶¶ 121-22.)  If the demand for pocket listings is so high, there is no need for real estate professionals to participate in a NAR-affiliated MLS—like CRMLS—and thus there is no need for them to abide by the Policy.

Ultimately, there is no requirement that a real estate professional has to belong to NAR or participate in a NAR-affiliated MLS.  But if a real estate professional wants the benefits of participation in CRMLS, it must also abide by CRMLS's policies.  The Policy simply eliminates the problem of real estate professionals benefitting from the contributions of others without having the reciprocal obligation to contribute to the MLS themselves.  If a real estate professional does not want to comply with that rule, they are free to join a non-NAR affiliated MLS, like PLS.

**D.    The FAC Fails to Establish that the Policy has Anti-Competitive Effects**

"Under [the rule of reason] framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Amex.*, 138 S.Ct. at 2284.  "The goal is to distinguish between restraints with anticompetitive effects that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest."  *Id.*

Here, the FAC is fundamentally flawed because it does not (and cannot) establish that the Policy has anticompetitive effects; rather, the Policy stimulates competition and its effects are in the consumer's best interest, as recognized by the Northern District of California in the *Top Agent Network v. NAR* case.  *See Top Agent*, 2020 WL 4013223 at *1.  Thus, for the reasons thoroughly discussed

/ / /

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA  92501
951-783-9470

23
**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FRCP 12(b)(6)**

C1244/001 - 246655.1

above[7], the FAC fails to allege facts demonstrating that CRMLS's adoption and implementation of the Policy has anticompetitive effects.

**E.     The FAC Should be Dismissed *Without* Leave to Amend**

A district court must generally give a plaintiff "at least one chance to amend a deficient complaint, absent a clear showing that the amendment would be futile." *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

Here, PLS has already had one opportunity to amend its complaint after the parties met and conferred.  The parties then met and conferred a *second* time after PLS filed its First Amended Complaint, and the parties stipulated that PLS would have the opportunity to file a Second Amended Complaint if it chose to do so. (Dkt. No. 43.)  PLS chose not to amend again.  Therefore, because PLS has already had an opportunity to cure the deficiencies in its pleading and because, as discussed herein, the FAC is fatally flawed and thus amendment would be futile, CRMLS's motion should be granted without leave to amend.

**V.**

**CONCLUSION**

Because the FAC has alleged to state a claim upon which relief can be granted, the FAC should be dismissed without leave to amend.

Dated:  August 13, 2020          STREAM KIM HICKS WRAGE & ALFARO PC


                                 */s/ Robert J. Hicks*
                                 _____
                                 Robert J. Hicks
                                 Theodore K. Stream
                                 Andrea Rodriguez
                                 Attorneys for Defendant,
                                 CALIFORNIA REGIONAL MULTIPLE
                                 LISTING SERVICE, INC.

---

[7] *See supra* section IV(A) on pages 5-9.

STREAM|KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
STE 700
RIVERSIDE, CA 92501
951-783-9470

24

MOTION TO DISMISS FIRST AMENDED COMPLAINT
PURSUANT TO FRCP 12(b)(6)

C1244/001 - 246655.1

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2020, I electronically filed the foregoing **NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) FILED BY DEFENDANT CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC.**with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the ECF registrants at the email addresses indicated on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on August 13, 2020, Riverside, California.

*/s/ Kimberly Trease*

Kimberly Trease
STREAM KIM HICKS WRAGE &
ALFARO, PC
3403 Tenth Street, Suite 700
Riverside, CA 92501
(951) 783-9470    Fax: (951) 783-9450
Email:  Kimberly.Trease@streamkim.com

STREAM KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
SUITE 700
RIVERSIDE, CA  92501-3335
(951) 783-9470

- 1 -
CERTIFICATE OF SERVICE

C1244/001 - 246655.1

1

## SERVICE LIST

2

Electronic Mail Notice List:

3

| | |
|---|---|
| 4 | Scott R. Commerson | Ashlee Aguiar |
| Davis Wright Tremaine LLP | David Wright Tremaine LLP |

| Scott R. Commerson<br>Davis Wright Tremaine LLP<br>865 South Figueroa Street, Suite 2400<br>Los Angeles, CA  90017-2566<br>Telephone: (213) 633-6800<br>Fax: (213) 633-6899<br>Email:  scottcommerson@dwt.com<br>Email:  elizabetharellano@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC<br>(LEAD ATTORNEY) | Ashlee Aguiar<br>David Wright Tremaine LLP<br>1300 SW Fifth Avenue, Ste. 2400<br>Portland, OR  97201<br>Telephone:  (503) 241-2300<br>Fax:  (503) 778-5299<br>Email:  ashleeaguiar@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC |
| Christopher G. Renner<br>David Wright Tremaine LLP<br>1919 Pennsylvania Ave. NW, Ste. 800<br>Washington, DC  20006<br>Telephone:  (202) 973-4200<br>Fax:  (202) 973-4499<br>Email:  chrisrenner@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC | Douglas E. Litvack<br>David Wright Tremaine LLP<br>1919 Pennsylvania Ave. NW, Ste. 800<br>Washington, DC  20006<br>Telephone:  (202) 973-4200<br>Fax:  (202) 973-4499<br>Email:  douglitvack@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC |
| Everett W. Jack, Jr.<br>Davis Wright Tremaine LLP<br>865 South Figueroa Street, 24th Floor<br>Los Angeles, CA  90017-2566<br>Telephone:  (213) 633-6800<br>Fax:  (213) 633-6899<br>Email:  everettjack@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC | John F. McGrory, Jr.<br>Davis Wright Tremaine LLP<br>1300 SW Fifth Avenue, Ste. 2400<br>Portland, OR  97201<br>Telephone:  (503) 241-2300<br>Fax:  (503) 778-5299<br>Email:  johnmcgrory@dwt.com<br><br>Attorneys for Plaintiff,<br>The PLS.com, LLC |
| / / / | |

STREAM KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
SUITE 700
RIVERSIDE, CA  92501-3335
(951) 783-9470

- 2 -
CERTIFICATE OF SERVICE

C1244/001 - 246655.1

| | |
|---|---|
| Ethan C. Glass<br>Quinn Emanuel Urquhart<br>and Sullivan, LLP<br>1300 I Street NW, Suite 900<br>Washington, DC 20005<br>Telephone: (202) 538-8265<br>Fax: (202) 538-8100<br>Email: ethanglass@quinnemanuel.com<br>Email: peterbenson@quinnemanuel.com<br><br>Attorneys for Defendant,<br>The National Association of Realtors<br>(LEAD ATTORNEY) | Michael D. Bonanno<br>Quinn Emanuel Urquhart<br>and Sullivan, LLP<br>1300 I Street NW, Suite 900<br>Washington, DC 20005<br>Telephone: (202) 538-8000<br>Fax: (202) 538-8100<br>Email: mikebonanno@quinnemanuel.com<br><br>Attorneys for Defendant,<br>The National Association of Realtors |
| Robert Patrick Vance, Jr.<br>Quinn Emanuel Urquhart<br>and Sullivan, LLP<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, CA 90017-2543<br>Telephone: (213) 443-3000<br>Fax: (213) 443-3100<br>Email: bobbyvance@quinnemanuel.com<br><br>Attorneys for Defendant,<br>The National Association of Realtors | William A. Burck<br>Quinn Emanuel Urquhart<br>and Sullivan, LLP<br>1300 I Street NW, Suite 900<br>Washington, DC 20005<br>Telephone: (202) 538-8000<br>Fax: (202) 538-8100<br>Email: williamburck@quinnemanuel.com<br><br>Attorneys for Defendant,<br>The National Association of Realtors |
| Jerrold E. Abeles<br>Arent Fox LLP<br>555 West Fifth Street, 48th Floor<br>Los Angeles, CA 90013-1065<br>Telephone: (213) 629-7400<br>Fax: (213) 629-7401<br>Email: jerry.abeles@arentfox.com<br><br>Attorneys for Defendants,<br>Bright MLS, Inc. and<br>Midwest Real Estate Data, LLC<br>(LEAD ATTORNEY)<br><br>/ / / | Brian D. Schneider<br>Arent Fox LLP<br>1717 K. Street NW<br>Washington, DC 20006-5344<br>Telephone: (202) 857-6000<br>Fax: (202) 857-6395<br>Email: brian.schneider@arentfox.com<br><br>Attorney for Defendants<br>Bright MLS, Inc. and<br>Midwest Real Estate Data, LLC |

- 3 -
CERTIFICATE OF SERVICE

C1244/001 - 246655.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Wendy Qiu
Arent Fox LLP
555 West Fifth Street, 48th Floor
Los Angeles, CA  90013
Telephone :  (213) 629-7400
Fax:  (213) 629-7401
Email:  wendy.qiu@arentfox.com

Attorneys for Defendants,
Bright MLS, Inc. and
Midwest Real Estate Data, LLC

STREAM KIM
ATTORNEYS AT LAW
3403 TENTH STREET,
SUITE 700
RIVERSIDE, CA  92501-3335
(951) 783-9470

- 4 -
CERTIFICATE OF SERVICE

C1244/001 - 246655.1