QUINN EMANUEL URQUHART & SULLIVAN, LLP
Ethan Glass (Bar No. 216159)
   ethanglass@quinnemanuel.com
William A. Burck (*pro hac vice*)
   williamburck@quinnemanuel.com
Michael D. Bonanno (*pro hac vice*)
   mikebonanno@quinnemanuel.com
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Telephone:   (202) 538-8000
Facsimile:   (202) 538-8100

Robert P. Vance, Jr. (Bar No. 310879)
   bobbyvance@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California  90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Defendant National
Association of REALTORS®

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| THE PLS.COM, LLC, a California limited liability company,<br><br>        Plaintiff,<br><br>    vs.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, BRIGHT MLS, INC., MIDWEST REAL ESTATE DATA, LLC, and CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC.,<br><br>        Defendants. | Case No. 2:20-cv-04790-PA-RAO<br><br>**DEFENDANT NATIONAL ASSOCIATION OF REALTORS'® NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br>[Fed. R. Civ. P. 12(b)(6)]<br><br>Hearing Date:   September 14, 2020<br>Time:        1:30 p.m.<br>Place:       Courtroom 9A<br>Judge:     Hon. Percy Anderson |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on September 14, 2020,[1] at 1:30 p.m., before the Honorable Percy Anderson, in Courtroom 9A, at the First Street Courthouse, 350 West 1st Street, 9th Floor, Los Angeles, California 90012, Defendant National Association of REALTORS® ("NAR") will and hereby does move the Court to dismiss Plaintiff The PLS.com, LLC's ("PLS's") First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  NAR seeks dismissal of both counts alleged in PLS's First Amended Complaint on the ground that PLS has not stated a claim upon which relief can be granted.  PLS has not alleged facts plausibly demonstrating that NAR has violated Section 1 of the Sherman Act or California's Cartwright Act.

This motion is based on the notice of motion; the attached memorandum of points and authorities; the records and papers on file in this action; all matters of which the Court may take judicial notice; and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

This motion is made following two conferences of counsel pursuant to L.R. 7-3, which took place on July 10 and July 27, 2020.

DATED:  August 13, 2020          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  */s/ Ethan Glass*
Ethan Glass (Bar No. 216159)
Attorneys for Defendant National
Association of REALTORS®

---

[1]    The parties filed a Joint Stipulation (ECF No. 51) that, if approved, would continue the hearing date until September 28, 2020.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................1

BACKGROUND ........................................................................................2

ARGUMENT .............................................................................................5

I.      PLS HAS NOT SUFFERED ANTITRUST INJURY ......................6

II.     THE CLEAR COOPERATION POLICY DOES NOT REDUCE
        COMPETITION ..........................................................................10

        A.      PLS Alleges No Direct Evidence of Anticompetitive Effects..............10

        B.      PLS Fails to Allege Facts Showing Anticompetitive Effects
                Indirectly ...........................................................................11

                1.      PLS's Market Definitions Are Facially Implausible .................11

                2.      PLS's Conclusory Market Share Allegations Do Not Show
                        Defendants Have Market Power ..................................14

                3.      PLS Has Not Alleged Facts Showing Barriers to Entry.............15

                4.      The Clear Cooperation Policy Enhances Overall Efficiency .....17

III.    PLS'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.......20

CONCLUSION.........................................................................................20

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page</u>

3

### CASES

4    *AFMS, LLC v. United Parcel Serv. Co.,*
        No. 10-5830, 2011 WL 13128436 (C.D. Cal. Nov. 23, 2011).............................7

5    *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California,*
6        190 F.3d 1051 (9th Cir. 1999) ...................................................................6

7    *Ashcroft v. Iqbal,*
        556 U.S. 662 (2009)....................................................................................5
8
9    *Bailey v. Allgas, Inc.,*
        284 F.3d 1237 (11th Cir. 2002) ................................................................13

10   *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.,*
11       2016 WL 3880989 (N.D. Cal. July 18, 2016) .........................................15

12   *Bell Atl. Corp. v. Twombly,*
        550 U.S. 544 (2007)..............................................................................5, 20

13   *Brantley v. NBC Universal, Inc.,*
14       675 F.3d 1192 (9th Cir. 2012) .................................................................19

15   *ChriMar Sys., Inc v. Cisco Sys., Inc.,*
        72 F. Supp. 3d 1012 (N.D. Cal. 2014).....................................................12
16
17   *Cty. of Tuolumne v. Sonora Cmty. Hosp.,*
        236 F.3d 1148 (9th Cir. 2001) ...................................................................6

18   *Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
19       504 U.S. 451 (1992).................................................................................12

20   *G.H.I.I. v. MTS, Inc.,*
        147 Cal. App. 3d 256 (1983) ......................................................................6

21   *Garnica v. HomeTeam Pest Def., Inc.,*
22       230 F. Supp. 3d 1155 (N.D. Cal. 2017)....................................................15

23   *Hip Hop Beverage Corp. v. Monster Energy Co.,*
        733 F. App'x 380 (9th Cir. 2018)...............................................................9
24
25   *Image Tech. Servs., Inc. v. Eastman Kodak Co.,*
        125 F.3d 1195 (9th Cir. 1997) .................................................................14

26   *United States v. Joyce,*
27       895 F.3d 673 (9th Cir. 2018) ...................................................................10

28

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) ................................................................ 17

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ................................................ 5, 6, 8, 18

*Los Angeles Land Co. v. Brunswick Corp.*,
    6 F.3d 1422 (9th Cir. 1993) .................................................................. 16

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018) .................................................................... 18

*Newcal Indus., Inc. v. Ikon Office Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ........................................................ 11, 12

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).................................................................. *passim*

*Oltz v. St. Peter's Cmty. Hosp.*,
    861 F.2d 1440 (9th Cir. 1988) .............................................................. 13

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    939 F. Supp. 2d 1002 (N.D. Cal. 2013).............................................. 13

*Pool Water Prods. v. Olin Corp.*,
    258 F.3d 1024 (9th Cir. 2001) ...................................................... 1, 6, 7

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,
    2013 WL 3873074 (S.D. Cal. July 25, 2013)...................................... 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................. 6

*Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*,
    399 F. Supp. 3d 1018 (C.D. Cal. 2019)............................................... 15

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986)............................................................. 18

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ................................................................ 13

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) .................................................................... 9

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ........................................... 11, 12, 13, 18

*Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*,
    No. 20-3198, 2020 WL 4013223 (N.D. Cal. July 16, 2020)........... *passim*

*Wahoo Int'l, Inc. v. Phix Doctor, Inc.*,
   No. 13-1395, 2015 WL 11237667 (S.D. Cal. Feb. 19, 2015) ................................7

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
   382 U.S. 172 (1965) ...............................................................................................13

### ADDITIONAL AUTHORITIES

Aaron S. Edlin & Robert G. Harris, *The Role of Switching Costs in Antitrust
   Analysis: A Comparison of Microsoft and Google*,
   15 Yale J. L. & Tech. 169 (2013) ........................................................................17

Rochet & Tirole, *Platform Competition in Two-Sided Markets*,
   1 J. Eur. Econ. Assn. 990, 1013 (2003) ................................................................9

Case No. 2:20-cv-04790-PA-RAO
NAR's Motion to Dismiss PLS's First Amended Complaint

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

PLS filed this antitrust suit to unwind the benefits of the Clear Cooperation Policy, which ensures  information about homes for sale in a particular city or town is broadly publicized to consumers through the local multiple listing service.  Unlike Defendants, PLS wants to restrict access to real estate listings—at the expense of home buyers and home sellers—by removing properties from the local multiple listing service and controlling who can (and who cannot) see them through its own private listings platform.  That is what this lawsuit is about, but that is not how the antitrust laws work.

The antitrust laws exist to protect consumers, not competitors like PLS, and PLS has failed to make the required, threshold showing that it has suffered an "antitrust injury" arising from purported harm to consumers caused by the Policy.  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("[R]educed profits from lower prices and decreased market share is not the type of harm" the antitrust laws are "meant to protect against.").  That is because, as Judge Chhabria in the Northern District of California recently found in a case involving substantially the same allegations that are at issue here, "[i]t is far more likely that the policy benefits buyers and sellers by increasing access to information about the housing market, thus increasing market efficiency and stimulating competition." *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*, No. 20-3198, 2020 WL 4013223, at *1 (N.D. Cal. July 16, 2020).  Because PLS has failed to allege facts showing it has suffered antitrust injury, it does not have standing to pursue its claims, and its complaint should be dismissed.

Beyond the threshold requirement of antitrust injury, PLS has failed to assert several elements of a valid antitrust claim.  Its complaint lacks sufficient facts to show: (1) the relevant  product and geographic markets in which competition has purportedly been harmed; (2) Defendants' purported market power in those markets; (3) the existence of entry barriers in those markets; or (4) how, given its procompetitive

justifications, the Policy injures competition.  To sustain a claim under Section 1 of the Sherman Act or the Cartwright Act, a plaintiff must allege facts that, taken as true, would show it can prevail on each of those elements of its claim.  PLS, however, has offered only hollow, conclusory allegations.  PLS has therefore failed to state a claim upon which relief could be granted, and its complaint should be dismissed.

## BACKGROUND

A multiple listing service is a searchable database of the properties listed for sale in a particular geographic region.  The service "combines its members' home listings information" into a single, centralized platform.  First Amended Complaint ("FAC") ¶ 32 (ECF No. 46).  "By listing in the MLS, a licensed real estate professional can market properties to a large set of potential buyers," and through "searching the MLS, a licensed real estate professional representing a buyer can provide that buyer with information about all the listed homes in the area that match the buyer's housing needs."  *Id.*  Properties listed on a multiple listing service therefore enjoy "wide exposure," *id.* ¶ 6, which increases the information about the housing market that is available to buyers and sellers.

"NAR does not itself provide MLS services."  FAC ¶ 119.  It "is a trade association" that, among other things, "establishes . . . policies and professional standards for its over 1.4 million members."  *Id.* ¶ 17.  NAR's policies include a code of ethics for REALTORS® and rules for REALTOR® association-owned multiple listing services.  *Id.*

PLS alleges that California Regional Multiple Listing Service, Inc. ("CRMLS") and Bright MLS, Inc. ("Bright") are REALTOR® association-owned multiple listing services that are "governed and controlled by NAR rules."  FAC ¶¶ 18-19.  Midwest Real Estate Data, LLC ("MRED"), on the other hand, is ***not*** a REALTOR® association-owned multiple listing service and is ***not*** governed and controlled by NAR rules and policies, as the absence of such allegations in the complaint confirms.  *Id.* ¶ 20.

In recent years, the use of so-called "pocket listings," which are not submitted to a multiple listing service, has "skyrocketed," "particularly in large and competitive real estate markets such as Los Angeles, San Francisco, Miami, and Washington D.C." FAC ¶ 7 ("In some of these markets, 20 percent or more of residential real estate was being sold outside the NAR-affiliated MLS system, primarily as pocket listings."). When a seller "pockets" a listing, her agent "privately share[s] [it] with other licensed real estate professionals while avoiding . . . exposure of th[e] listing[] through the NAR-affiliated MLSs" to other agents and the general public. *Id.* ¶ 8. PLS operates a private platform that facilitates pocket listings by allowing its participants to share listings only with other users of the PLS platform. *Id.* ¶¶ 8, 60-61. Unlike a listing on a multiple listing service, a pocket listing on PLS is hidden from agents who are not members of PLS (and the public at large). *Id.* ¶ 8 ("By joining PLS, licensed real estate professionals could privately share pocket listings . . . .").

As recognized in MRED's October 2019 publication about off-MLS listings that PLS references in the complaint, *see* FAC ¶ 77, pocket listings raise many potential legal and ethical problems, *see* MRED, *Private, Not A Secret: An inside look at off-MLS listing solutions*, at 4, 8 (2019), *available at* https://infogram.com/private-not-a-secret-1h174917q7zd6zj?live. Generally speaking, wide exposure of a property that is for sale through a multiple listing service increases potential offers, which yields a higher price for the home seller. "Limiting the exposure of a listing to a subset of the market can reduce its ultimate selling price, which brings the ability of the listing agent to fulfill their fiduciary responsibilities to their seller into question." *Id.* at 8. The use of pocket listings—particularly when "the seller is not made fully aware of the limitations on marketing imposed by keeping a listing outside of the MLS"—may also "be a violation of applicable Code of Ethics and local license laws." *Id.*

To address the problems caused by the increasing use of pocket listings, NAR publicly proposed, discussed, and ultimately adopted the Clear Cooperation Policy, which provides:

1       Within one (1) business day of marketing a property to the public, the

2       listing broker must submit the listing to the MLS for cooperation with

3       other MLS participants. Public marketing includes, but is not limited to,

4       flyers displayed in windows, yard signs, digital marketing on public

5       facing websites, brokerage website displays (including IDX and VOW),

6       digital communications marketing (email blasts), multi-brokerage listing

7       sharing networks, and applications available to the general public.

8 FAC ¶ 89.

9       The drafters of the Policy recognized that, "when the benefits of broad listing

10 exposure are in the best interest of clients," it is in the clients' interest for "MLS

11 participants to share . . . listings." Sam DeBord, *Advisory Board Proposes MLS Policy*

12 *to Fuel Broker Cooperation*, REALTOR® Magazine (Sept. 27, 2019), *available at*

13 https://magazine.realtor/daily-news/2019/09/27/advisory-board-proposes-mls-policy-

14 to-fuel-broker-cooperation (quoted at FAC ¶ 72). NAR also recognized, however, that

15 in a small number of cases—for example, in the case of expensive homes owned by

16 celebrities—a home seller may not want to broadly market her property to the public

17 despite the benefits that flow from widespread exposure. *See id.* ("[C]lients whose

18 circumstances override the benefits of increased exposure, such as celebrity status or

19 difficult life situations, can be accommodated within the proposed policy's

20 guidelines."). To accommodate the interests of that small group of sellers, the Policy

21 permits "listings [to be] marketed entirely within a brokerage firm, without submission

22 of those listing[s] to the MLS," which are called "office exclusives." FAC ¶ 93. The

23 Policy thus gives a seller complete control over how her home will be marketed by her

24 real estate agent: she can (1) choose to publicly market the property and engage a

25 broker who uses a multiple listing service; or (2) give up the benefits of a multiple

26 listing service and market her property to a limited group of potential buyers (through

27 an office exclusive or by working with a real estate agent who is not a member of the

28 local multiple listing service). FAC ¶¶ 28-29, 93 (recognizing that not all sellers use

licensed real estate professionals, that not all licensed real estate professionals are members of NAR, and that office exclusives remain permissible under the Policy.

Through this lawsuit, PLS seeks a Court order to rescind the Clear Cooperation Policy.  FAC at 28 (seeking an "Order permanently enjoining the Defendants from enforcing the Clear Cooperation Policy or any variant of that policy").

## LEGAL STANDARD

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  The plaintiff must proffer "well-pleaded ***facts***" from which the Court may "infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (emphasis added).  The factual allegations must "plausibly give rise to an entitlement to relief." *Id.*

This standard is critical in antitrust cases.  "[D]iscovery in antitrust cases frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  Antitrust plaintiffs must therefore "plead not just ultimate facts (such as a conspiracy), but evidentiary facts which, if true, will prove" all elements of the alleged claim. *Id.*  Complaints that lack such factual allegations do not state a claim upon which relief can be granted and should be dismissed. *See id.* at 1047-48.

## ARGUMENT

PLS asserts claims under Section 1 of the Sherman Act and under California's Cartwright Act.  Both claims are analyzed under the same legal standard. *See name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015) ("Because the analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the

1  Cartwright Act claim." (citations omitted)).   To assert a valid claim under either

2  statute, a plaintiff must plead facts sufficient to show the plausible existence of "(1) a

3  contract, combination or conspiracy among two or more persons or distinct business

4  entities; (2) by which the persons or entities intended to harm or restrain trade or

5  commerce among the several States, or with foreign nations; (3) which actually injures

6  competition." *Kendall*, 518 F.3d at 1047 (reciting the standard "[t]o state a claim

7  under Section 1 of the Sherman Act"); *see G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256,

8  265 (1983) (pleading a Cartwright Act claim requires allegations of a "conspiracy,"

9  "illegal acts done pursuant" to the conspiracy with the "purpose to restrain trade," and

10  "damage caused by such acts"); *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d

11  1148, 1160 (9th Cir. 2001) ("The analysis under California's [Cartwright Act] mirrors

12  the analysis under federal law . . . .").   PLS has failed to meet that standard.

13  **I.    PLS HAS NOT SUFFERED ANTITRUST INJURY**

14  "It is well established that the antitrust laws are only intended to preserve

15  competition for the benefit of consumers." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of

16  California*, 190 F.3d 1051, 1055 (9th Cir. 1999).   For that reason, a plaintiff can

17  sustain an antitrust claim only when it has suffered an "antitrust injury." *Pool Water

18  Prods.*, 258 F.3d at 1034, 1036.   To plead facts sufficient to show antitrust injury, "[i]t

19  is not enough to show that one's injury was caused by illegal behavior." *Id.* at 1034.

20  The plaintiff must allege facts showing it was injured by "acts that harm 'allocative

21  efficiency *and* raise[] the price of goods above their competitive level or diminish[]

22  their quality.'" *Id.* (quoting *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1433

23  (9th Cir. 1995)).   In other words, a plaintiff must plead facts showing the damages it

24  purportedly sustained flow from actions taken by the defendant that also harm

25  competition and consumers.

26  PLS has not alleged any injury that stems from harm to competition and

27  therefore it has failed to plead facts sufficient to show it has suffered an antitrust

28  injury.   The injuries identified in PLS's complaint—fewer listings, reduced

participation, "lost profits and damaged equity and goodwill," FAC ¶¶ 121-22—are harms suffered only by PLS .  Those injuries are not harm to competition or harm to consumers.  In essence, PLS claims it has been harmed because the Policy requires listings to be publicized in a multiple listing service *in addition to* PLS's platform and therefore PLS may lose out on some listings altogether.  But "[s]hifting [a plaintiff's] sales to . . . other competitors in the market does not directly affect consumers and therefore does not result in antitrust injury."  *Pool Water Prods.*, 258 F.3d at 1036.  That means PLS's allegations of harm amount only to "injury to a single competitor," which "does not suffice to support a Section 1 claim."  *AFMS, LLC v. United Parcel Serv. Co.*, No. 10-5830, 2011 WL 13128436, at *16 (C.D. Cal. Nov. 23, 2011); *see also Wahoo Int'l, Inc. v. Phix Doctor, Inc.*, No. 13-1395, 2015 WL 11237667, at *5 (S.D. Cal. Feb. 19, 2015) ("[E]limination of a single competitor, alone, does not demonstrate antitrust injury.").

As the complaint makes clear, it is PLS's entire business model—not the Clear Cooperation Policy—that is designed to restrict output and harm consumers.  PLS claims that, through its private network, "real estate professionals . . . could share as much or as little information about [a] listing" as they want, FAC ¶ 61, while avoiding the "wide exposure that comes from listing a property in NAR-affiliated MLSs," *id.* ¶ 6.  These allegations show that PLS wants to restrict output and undermine the "benefits [the Policy provides to] buyers and sellers"—"increas[ed] access to information about the housing market," which, in turn, "increas[es] market efficiency and stimulat[es] competition."  *Top Agent Network*, 2020 WL 4013223, at *1.

Moreover, to state a valid claim, PLS needs to plausibly allege an injury caused by acts that harm consumers on *both* sides of the two-sided market for residential real estate listings: buyers and sellers of residential real estate.  *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2287 (2018) ("*Amex*") ("Evaluating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition.").  PLS appears to recognize as much because its complaint includes a conclusory assertion that the

Clear Cooperation Policy "also [harms] . . . buyers and sellers of residential real estate." FAC ¶ 114.  But PLS offers no *facts* to support that contention.  Indeed, PLS does not even try to explain how home buyers and sellers might be harmed by the Policy, and it alleges no facts that, if true, would plausibly show the Policy has "reduced output, increased prices, or decreased quality" for buyers and sellers of real estate in any market.  *Amex*, 138 S. Ct. at 2284.  Without "evidentiary facts" that back up its conclusions, PLS's bare declaration that consumers have been harmed is not enough to state a valid claim.  *See Kendall*, 518 F.3d at 1047-48 (dismissing a Sherman Act claim because plaintiffs "pleaded only ultimate facts, such as conspiracy, and legal conclusions," while "fail[ing] to plead the necessary evidentiary facts to support those conclusions").

PLS invokes semantics to avoid the Supreme Court's *Amex* decision and its requirement that PLS must show harm to both buyers and sellers of real estate, flatly claiming: "[l]isting network services are not a two-sided transaction market because listing networks do not involve a simultaneous sale between buyers and sellers of real estate."  FAC ¶ 99.  But PLS also concedes that listing services "facilitate[] . . . residential real estate transactions," *id*. ¶ 31, and a real estate transaction *is* a single simultaneous transaction between a buyer and seller.  In the same paragraph where PLS denies that listing services are two-sided antitrust markets, it further concedes that its customers are "agents [who] represent[] buyers, sellers, or both" and that PLS offers different services to the agents on different sides of the market—"the listing network gives real estate agents the ability to list properties for sale or view available properties for sale."  *Id.* ¶ 99.  Thus, according to PLS's own allegations, listing networks fall squarely within the Supreme Court's definition of two-sided markets.  PLS "offers different . . . services to two different groups who both depend on the platform to intermediate between them."  *Amex*, 138 S. Ct. at 2280.

Courts "should combine different products or services into a single market when that combination reflects commercial realities."  *Amex*, 138 S. Ct. 2285 (quotation

marks and brackets omitted).  In fact, there is no distinction between the real estate transactions at issue here and the credit card transactions involved in *Amex*.  The seminal article on the concept of "two-sided markets" addressed by the Supreme Court in *Amex* is *Platform Competition in Two-Sided Markets*, which was written by Jean-Charles Rochet and Jean Tirole.  *See Amex*, 138 S. Ct. 2281 (citing Rochet & Tirole, *Platform Competition in Two-Sided Markets*, 1 J. Eur. Econ. Assn. 990, 1013 (2003)).  In that paper, Professors Rochet and Tirole specifically identify real estate as a quintessential two-sided market.  *See* Rochet & Tirole, 1 J. Eur. Econ. Assn. at 991-93 & n.1, *available at* https://www.rchss.sinica.edu.tw/cibs/pdf/RochetTirole3.pdf.

Without pleading evidentiary facts showing that the Clear Cooperation Policy somehow harms buyers and sellers of real estate—and without allegations then connecting alleged consumer harm to its alleged injury—PLS has not pleaded antitrust injury.  It has not therefore stated a valid antitrust claim, and its complaint may be dismissed for that reason alone.  *See name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, No. 12-8676, 2013 WL 2151478, at *6 (C.D. Cal. Mar. 4, 2013) ("[Plaintiff] alleges no evidentiary facts suggesting that the fee has actually injured competition.  The injury Plaintiff alleges to its preferred business model is insufficient to support an antitrust claim."); *see also SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) ("Dismissal for failure to state a claim is appropriate where the complaint states no set of facts which, if true, would constitute an antitrust offense, notwithstanding its conclusory language regarding the elimination of competition and improper purpose."  (quotation marks omitted)); *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381 (9th Cir. 2018) (unpublished) (affirming dismissal of a complaint, holding that plaintiff "failed to adequately plead injury to competition, as is required to state a claim for a violation of the Sherman Act," and holding that the "conclusory assertion that consumer prices had been driven upward was insufficient").

## II.     THE  CLEAR  COOPERATION  POLICY  DOES  NOT  REDUCE COMPETITION

"Section  1  [of  the  Sherman  Act]  prohibits  only  agreements that *unreasonably* restrain trade."  *United States v. Joyce*, 895 F.3d 673, 676 (9th Cir. 2018).  "Restraints can be unreasonable in one of two ways."  *Amex*, 138 S. Ct. at 2283.  "A small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output."  *Id.* (quotation marks omitted).  And the remainder "are judged under the 'rule of reason.'"  *Id.* at 2284.

PLS has not alleged a *per se* violation of the Sherman Act, and its allegations under the rule of reason fall short of what is required to survive a motion to dismiss. In a rule of reason analysis, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market."  *Amex*, 138 S. Ct. at 2284.  This burden can be satisfied through direct evidence—"proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market."  *Id.* (quotation marks, citations, and brackets omitted).  Or it can be satisfied through indirect evidence—"proof of market power plus some evidence that the challenged restraint harms competition."  *Id.*  PLS's complaint does not contain factual allegations that, taken as true, would be sufficient to meet its burden with either type of evidence.

### A.     PLS Alleges No Direct Evidence of Anticompetitive Effects

As discussed in Section I, PLS has not pleaded facts showing the Policy reduced output, increased prices, or decreased quality for any consumer of real estate listings. The injuries alleged in its complaint are instead injuries to PLS itself, not harm to consumers.  *See* FAC ¶¶ 121-22.  Indeed, PLS recognizes that multiple listing services and the Clear Cooperation Policy offer ***benefits*** to consumers by allowing "real estate professional[s to] market properties to a large set of potential buyers" and to "provide . . . buyer[s] with information about all the listed homes in the area that match the buyer's housing needs."  *Id.* ¶ 32.  It is PLS, not Defendants, who is seeking to

1   reduce consumers' access to information about the residential property market. *Id.* ¶¶

2   61-62.   Thus, there are no factual allegations concerning direct evidence of

3   anticompetitive effects in PLS's complaint.[1]

4       **B.**    **PLS Fails to Allege Facts Showing Anticompetitive Effects Indirectly**

5          To prove market power through indirect evidence, "a plaintiff must: (1) define

6   the relevant market, (2) show that the defendant owns a dominant share of that market,

7   and (3) show that there are significant barriers to entry and show that existing

8   competitors lack the capacity to increase their output in the short run." *Rebel Oil*, 51

9   F.3d at 1434.  PLS's complaint falls short on all of these elements.

10          **1.**    **PLS's Market Definitions Are Facially Implausible**

11          "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's

12   'relevant market' definition is facially unsustainable." *Newcal Indus., Inc. v. Ikon*

13   *Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).  To be sustainable, a plaintiff must

14   plead facts that identify and support plausible product and geographic markets. *See*

15   *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001).  Neither PLS's

16   alleged product market nor its alleged geographic markets, however, pass muster.

17          **Product market.**  PLS alleges that the relevant product market is the market for

18   "listing networks that facilitate the sale of residential real estate listings among

19   licensed residential real estate professionals." FAC ¶ 97.  Because these networks are

20   used by agents representing both buyers and sellers, PLS has described a market that

21   "offers different products or services to two different groups"—buyers and sellers—

22   "who both depend on the platform to intermediate between them." *Amex*, 138 S. Ct. at

23   2280.  As PLS itself explains, agents representing home sellers use these services to

24       [1] Even if PLS did allege direct evidence, it still would have to identify a factually

25   supported relevant market in which the alleged agreement reduced competition. *See*

26   *Amex*, 138 S. Ct. at 2285 n.7 ("The plaintiffs argue that we need not define the relevant

27   market in this case because they have offered actual evidence of adverse effects on

28   competition . . . . We disagree. ").  And as discussed below, PLS has not met that

    burden. *See*, infra, § III.B.1.

advertise properties, and agents representing home buyers use them to search for potential purchases.  FAC ¶ 32.  Such two-sided markets must be defined to "include both sides of the platform," *Amex*, 138 S. Ct. at 2286; here, the buyers and their agents on one hand, and sellers and their agents on the other.  But PLS never analyzes its alleged market from both sides.  *See* FAC ¶ 99.  In so doing, it has failed to address the "actual market realities" of the two-sided market that is at issue here.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466-67 (1992).

Because PLS has failed to define the market to include buyers and sellers, its alleged markets contravene Supreme Court precedent, are facially unsustainable, and are grounds for dismissal.  *See Tanaka*, 252 F.3d at 1063 ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."); *ChriMar Sys., Inc v. Cisco Sys., Inc.*, 72 F. Supp. 3d 1012, 1018 (N.D. Cal. 2014) ("[A] complaint may be dismissed pursuant to Rule 12(b)(6) 'if the complaint's 'relevant market' definition is facially unsustainable.'" (quoting *Newcal Indus.*, 513 F.3d at 1045)).

**Geographic market.**  PLS contends that one relevant geographic market for the "provision of listing network services to licensed real estate professionals for the sale of residential real estate listings" is nationwide, FAC ¶ 100, and it alleges that "PLS and the NAR-affiliated MLSs," including the MLS Defendants, compete to offer services in this market, *id.* ¶ 97.  That claim is facially unsustainable.

PLS concedes that Bright, CRMLS, MRED, and REALTOR® association-owned multiple listing services in other parts of the country only serve limited geographic areas.  For example, CRMLS provides access to "listings for sale in California."  FAC ¶ 18.  Bright MLS "serv[es] the Mid-Atlantic region of the United States."  *Id.* ¶ 19.  MRED "serv[es] northern Illinois, southern Wisconsin, and northwest Indiana."  *Id.* ¶ 20.  All "MLSs . . . operat[e] in local or regional areas."  *Id.* ¶ 32.  And NAR, for its part, "does not itself provide MLS services."  *Id.* ¶ 119.  Thus, it does not contend that any Defendant provides a "listing network[] that facilitate[s]

the sale of residential real estate listings among licensed residential real estate professionals" nationwide.  Nor does it allege facts showing that home buyers and sellers consider multiple listing services in different parts of the country to be reasonable substitutes (*e.g.*, there is no reason to believe a homeowner selling a property in L.A. would substitute to Bright MLS if CRMLS raised its prices by a "SSNIP" of five to ten percent).  *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) ("A common method to determine the relevant geographic market . . . is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market.").

The complaint has several paragraphs alleging the existence of "consumer demand for a national listing network service."  FAC ¶¶ 47-49.  But a nationwide market for residential real estate is facially unsustainable, as it would mean that house buyers are indifferent to the city in which they purchase their homes.  "[T]he relevant market is defined as 'the area of effective competition.'"  *Amex*, 138 S. Ct. at 2285 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)).  As PLS concedes in the complaint, none of the Defendants operate a national multiple listing service, FAC ¶¶ 17-20, and thus they are not competitors in a nationwide market.

Alternatively, PLS alleges, "each and every service area of a NAR-affiliated MLS, including the service areas of each MLS Defendant, is a relevant geographic market."  FAC ¶ 100.  But "a geographic market cannot be drawn simply to coincide with the market area of a specific company," *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1249 (11th Cir. 2002); it must be defined by the boundaries "'of effective competition' . . . where buyers can turn for alternative sources of supply."  *Tanaka*, 252 F.3d at 1063 (quoting *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988)).  Without identifying the service areas at issue, PLS's putative geographic market is too vague to sustain a claim.  *See Orchard Supply Hardware LLC v. Home*

*Depot USA, Inc.*, 939 F. Supp. 2d 1002, 1010 (N.D. Cal. 2013) (rejecting "Plaintiff's definition of the relevant geographic market—'various regional markets in California and Oregon where Orchard and other retail sellers of power tools compete against one another'—[as] vague and conclusory").

> **2.     PLS's Conclusory Market Share Allegations Do Not Show Defendants Have Market Power**

No matter how the relevant market is defined, PLS has not plausibly alleged that any defendant "owns a dominant share." *Rebel Oil*, 51 F.3d at 1434.  To withstand a motion to dismiss using indirect proof of market power, PLS must allege facts that show Defendants have market power individually or collectively in the relevant market.  *See id.*; *Rheumatology Diagnostics*, 2013 WL 5694452, at *12 ("[T]he plaintiffs allege that Aetna 'insures approximately 9% of the U.S. population.'  However, they do not state Aetna's market share in any of the five product and geographic markets identified in the FAC . . . ." (citation omitted)).  PLS has not met that burden.

"Courts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  PLS, however, has not alleged any facts to substantiate its belief that defendants have market power.  It asserts in conclusory fashion that, "[o]n information and belief, each of the MLS Defendants has enjoyed a durably high share of over 65 percent of residential real estate listings marketed by licensed real estate professionals in their respective service areas," FAC ¶ 100, and that "[u]ntil recently, . . . NAR-affiliated MLSs facilitated the vast majority of residential real estate transactions," *id.* ¶ 31.  Those allegations are entirely unsupported.  Indeed, it is telling that PLS alleges the exact minimum market share required to satisfy the Ninth Circuit's standard for a finding of market power without (1) explaining how the share was calculated; (2) alleging what competitors it included in its estimate; or (3) identifying the sources it purportedly used to calculate its market share claim.  All of those failings confirm

that PLS has no alleged any facts to support its allegations and such unsupported claims are not enough to survive a motion to dismiss. *See Redbox Automated Retail, LLC v. Buena Vista Home Entm't, Inc.*, 399 F. Supp. 3d 1018, 1029 (C.D. Cal. 2019) ("[T]he FAC alleges that Disney's share of the home movies market is something 'greater' than fifty percent. Even if true, however, that fact is not sufficient to establish Disney's market power in the home movies market." (citation omitted)); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, 2013 WL 3873074, at *15 (S.D. Cal. July 25, 2013) (bare allegation that defendant was a "dominant force" held to be insufficient where there were "no other factual contentions in the amended complaint that support this conclusory statement"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 2016 WL 3880989, at *10 (N.D. Cal. July 18, 2016) ("The fact that Defendants are 'goliaths' or 'dominant players' are nothing more than conclusory allegations. . . ."). PLS has to allege evidentiary facts to substantiate its conclusions, and it has failed to do so.

Moreover, PLS's market power allegations about the MLS Defendants' respective service areas do not address whether Defendants have market power in PLS's purported nationwide market. Nor do they address "each and every service area of a NAR-affiliated MLS." FAC ¶ 100. Thus, PLS's market power allegations are deficient. *See Garnica v. HomeTeam Pest Def., Inc.*, 230 F. Supp. 3d 1155, 1157 (N.D. Cal. 2017) (facts concerning "market conditions in the aggregate" do not answer "key questions about monopoly power in the 32 [specifically alleged geographic] markets"); *Mich. Div.-Monument Builders*, 458 F. Supp. 2d at 480 ("Plaintiffs must plead a viable relevant product and geographic market, and allege that Defendants have market power *in that market*, in order to state a valid antitrust claim." (emphasis added)).

### 3.    PLS Has Not Alleged Facts Showing Barriers to Entry

A plaintiff seeking to prove a violation of Section 1 of the Sherman Act through indirect evidence must show that there are barriers to entering the relevant market.

"Entry barriers are additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants, or factors in the market that deter entry while permitting incumbent firms to earn monopoly returns." *Rebel Oil*, 51 F.3d at 1439 (quotation marks omitted).  Without such barriers, evidence of market share alone does not prove market power.  *See id.* ("A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme.").  Even establishing that a defendant has 100% of the market share does "not demonstrate that it ha[s] the power to control prices or exclude competition in the absence of any evidence that it could prevent entry of other market participants." *Los Angeles Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993).

PLS's conclusory claims that "[s]ubstantial barriers to entry exist," FAC ¶ 101, are belied by PLS's allegations that, just three years ago, PLS "launched successfully and grew quickly," *id.* ¶ 66.  Between its formation in 2017 and the adoption of the Clear Cooperation Policy in 2019, PLS alleges that it became a "serious competitive threat to the NAR-affiliated MLS system." *Id.* ¶¶ 58, 67.  "At the time the Clear Cooperation Policy was adopted," PLS claimed "nearly 20,000 licensed real estate professionals" as members.  *Id.* ¶ 66.  PLS's launch and growth make clear that there were few barriers to entry in 2017.  And PLS identifies no new barriers that have been erected since that time.

As the complaint acknowledges, moreover, PLS's customers can and do belong to both PLS and their local multiple listing service.  *See* FAC ¶ 121 (explaining that some PLS members have "removed [listings] from PLS and submitted [them] instead to NAR-affiliated MLSs").  This phenomenon—users of platform or network services joining multiple platforms or networks that provide similar services— is called "multi-homing," and it is further evidence that barriers to entry are low in the market for listing networks.  Where multi-homing occurs, a new entrant can achieve scale without having to convince customers to stop using an incumbent platform and switch to its less-established platform.  That allows new entrants to gain market share by offering

its services at a lower cost (or even for free), which commonly occurs in platform markets with no switching costs. *See* Aaron S. Edlin & Robert G. Harris, *The Role of Switching Costs in Antitrust Analysis: A Comparison of Microsoft and Google*, 15 Yale J. L. & Tech. 169, 212-13 (2013) (explaining the effects of low switching costs in the market for internet search engines). That is precisely what PLS alleges it did between 2017 and 2019. FAC ¶¶ 58-67. And nothing about the Clear Cooperation Policy changes this aspect of the market. If PLS or a new entrant offers a listing service that is better than the existing multiple listing service, members of multiple listing services can join and submit their listings to both platforms.

### 4. The Clear Cooperation Policy Enhances Overall Efficiency

Finally, "[p]roof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 291 (9th Cir. 1979). Because the market at issue here is two-sided, PLS had to allege that the net effect of NAR's challenged conduct—considering both real estate buyers and sellers—is higher prices, reduced output, or diminished quality for consumers. *See Amex*, 138 S. Ct. at 2287; *supra* § I. PLS's complaint does not engage in this required analysis. It never weighs the Clear Cooperation Policy's benefits against its alleged detriments, and it never tries to balance the Policy's effects on buyers and sellers.

As discussed in Section I, the Policy has recognized benefits for consumers on both sides of the market. It "benefits buyers and sellers by increasing access to information about the housing market." *Top Agent Network*, 2020 WL 4013223, at *1. These benefits in turn "increas[e] market efficiency and stimulat[e] competition." *Id.* And they render claims that "the policy hurts buyers and sellers . . . dubious." *Id.*

The Policy also combats free riding by multiple listing service participants who view other agents' listings information but withhold their own from the multiple listing service. *See Top Agent Network*, 2020 WL 4013223, at *1 ("[T]he policy operates to prevent agents from benefitting from the contributions of fellow NAR members while

withholding listings of their own."). In the context of standard setting and joint ventures, such as a multiple listing service, *see* FAC ¶ 32 ("MLSs are joint ventures . . . ."), the elimination of free riding is a procompetitive justification for a restraint that should be considered in a rule of reason analysis. *See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 43 (2d Cir. 2018) ("[I]t is permissible for courts to consider free riding and stability as two potential procompetitive justifications in the standard-setting context."); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229-30 (D.C. Cir. 1986) (holding that agreements, which made "[a] joint venture . . . more efficient," "do not violate section 1 of the Sherman Act" in part because they "preserve the efficiencies of the nationwide van line by eliminating the problem of the free ride").

To allege that conduct violates the rule of reason, a plaintiff must plead facts demonstrating that the conduct's "harm to competition outweighs its procompetitive effects." *Tanaka*, 252 F.3d at 1063. PLS has not done that. It simply has denied the existence of the Clear Cooperation Policy's procompetitive benefits. FAC ¶ 116 ("There is no cognizable or plausible procompetitive justification for the Defendants' unlawful conduct, or one that outweighs its anticompetitive effects."); *id.* ¶ 119 ("The Clear Cooperation Policy does not eliminate or prevent any free-riding . . . ."). But many of the Policy's benefits are evident from PLS's own allegations about the "wide exposure that comes from listing a property in NAR-affiliated MLSs." FAC ¶¶ 6, 32. And many are evident from the text of the Policy itself. *Id.* ¶ 89. The Policy "increas[es] access to information about the housing market," which benefits consumers. *Top Agent Network*, 2020 WL 4013223, at *1. PLS's denial that those benefits exist are not facts that could outweigh them. *See Kendall*, 518 F.3d at 1048 (antitrust plaintiffs must "plead the necessary evidentiary facts to support th[eir] conclusions").

PLS's allegations that NAR does not require REALTORS® to join multiple listing services and that, prior to the Clear Cooperation Policy's adoption, PLS

members paid fees to access multiple listing services further undermine PLS's claims. FAC ¶¶ 117-19.  The allegation that multiple listing service membership is optional shows that brokers have an option to join PLS and avoid the Policy: if a broker does not join a REALTOR® association-owned multiple listing service, she is free to market properties on PLS or otherwise.  And that does not undermine the multiple listing service because the broker cannot access the benefits of the service.  This is exactly what Judge Chhabria found.  Brokers receiving multiple listing service benefits while not contributing to the database undermine the multiple listing service; but brokers who are outside of the local multiple listing service do not.  *See Top Agent Network*, 2020 WL 4013223, at *1.  The Policy combats this sort of freeriding—it "operates to prevent agents from benefitting from the contributions of fellow NAR members while withholding listings of their own," *id.*—regardless of whether PLS's members paid fees to use their local multiple listing service.  The freeriding at issue is not accessing multiple listing services without paying fees.  It is taking advantage of the market information supplied by multiple listing service participants while simultaneously withholding market information from the service.  The Clear Cooperation Policy cuts down on that, making multiple listing services more efficient, and PLS has not pleaded any fact suggesting otherwise.

Even if some brokers opt not to join the multiple listing service, the Policy still increases access to information for all real estate professionals who are part of a REALTOR® association-owned multiple listing service and for their clients.  PLS itself pleads that the Policy increases the number of listings that are submitted to multiple listing services.  FAC ¶ 108.  Therefore, PLS is challenging a Policy with recognized procompetitive benefits.  *See Top Agent Network*, 2020 WL 4013223, at *1.  But it has not pleaded facts establishing anticompetitive effects that could outweigh those benefits, and it has not pleaded facts supporting its denial that the benefits exist.  It is left with, at best, "allegation[s] of a practice that may or may not injure competition."  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1198 (9th Cir.

2012).  That "is insufficient to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).

### III.   PLS'S COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Defendants met and conferred with PLS separately and together on numerous occasions, for over four hours combined, and explained PLS's pleading failures in detail.  PLS then amended its complaint.  After that amendment, Defendants met and conferred with PLS again.  The Court permitted—and PLS declined—an opportunity to amend its complaint a second time in light of the Defendants' comments during the last meet and confer.  Yet PLS still has not pleaded any claim upon which relief can be granted.  As shown by PLS's decision not to amend again, despite knowing all the arguments that Defendants would make, allowing additional amendment would be futile, and this case should be dismissed with prejudice.  *See name.space, Inc*, 2013 WL 2151478, at *9 (dismissing a claim with prejudice because "the Court concludes that no amendment could cure the deficiencies in [it]").

### CONCLUSION

For all of the foregoing reasons, NAR respectfully submits that PLS's First Amended Complaint should be dismissed in its entirely with prejudice.

DATED:  August 13, 2020          Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By */s/ Ethan Glass*
Ethan Glass (Bar No. 216159)
Attorneys for Defendant National
Association of REALTORS®