O

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PLS.COM, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>THE NATIONAL ASSOCIATION<br>    OF REALTORS;<br>BRIGHT MLS, INC.;<br>MIDWEST REAL ESTATE DATA,<br>    LLC; and<br>CALIFORNIA REGIONAL<br>    MULTIPLE LISTING SERVICE,<br>    INC.,<br><br>        Defendants. | Case No. 2:20-cv-04790-JWH-RAOx<br><br>**MEMORANDUM OPINION ON MOTIONS OF DEFENDANTS TO DISMISS PLAINTIFF'S AMENDED COMPLAINT [ECF Nos. 50, 53, & 55] and MOTION TO STRIKE OF DEFENDANT CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC. [ECF No. 54]** |

# I.  **INTRODUCTION**

This antitrust case concerns an alleged conspiracy among three regional real property multiple listing services—Defendants Bright MLS, Inc. ("Bright MLS"); Midwest Real Estate Data, LLC ("Midwest RED"); and California Regional Multiple Listing Service, Inc. ("Cal Regional MLS") (collectively, the "MLS Defendants")—and Defendant The National Association of Realtors ("NAR") to eliminate a competitor, Plaintiff The PLS.com, LLC.  PLS maintains that Defendants are engaging in an unreasonable restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16720(a)–(c).[1]

Before the Court are the three motions of Defendants Bright MLS and Midwest RED (jointly), Cal Regional MLS, and NAR, respectively, to dismiss PLS's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]  Also pending before the Court is the motion of Cal Regional MLS to strike the second claim for relief in PLS's Amended Complaint pursuant to California's Anti-SLAPP Statute, Cal. Civ. Proc. Code § 425.16.[3]  The Court held a hearing on Defendants' three Motions to Dismiss and on Cal Regional MLS's Motion to Strike on October 15, 2020.  After considering the papers filed in support of and in opposition to all four Motions[4] and the

---

[1]   First Am. Compl. (the "Amended Complaint") [ECF No. 46] ¶¶ 123 & 126.

[2]   Defs. Bright MLS's and Midwest RED's Mot. to Dismiss (the "Bright MLS & Midwest RED Motion") [ECF No. 50]; Def. Cal Regional MLS' Mot. to Dismiss (the "Cal Regional MLS Motion") [ECF No. 53]; and Def. NAR's Mot. to Dismiss (the "NAR Motion") [ECF No. 55] (collectively, the "Motions").

[3]   Def. Cal Regional MLS' Mot. to Strike Pl.'s Second Claim for Violation of the Cartwright Act Pursuant to Cal. Code Civ. Proc. § 425.16 (Anti-SLAPP Statute) (the "Motion to Strike") [ECF No. 54].

[4]   The Court considered the following papers:  (1) the Amended Complaint; (2) the Motions (including all of their respective supporting declarations and attachments); (3) the Motion to Strike; (4) Pl.'s Opp'n to the Motions (the "Opposition") [ECF No. 62]; (5) Pl.'s Opp'n to the Motion to Strike [ECF No. 63]; (6) Defs. Bright MLS's and Midwest RED's Reply in Supp. of Mot. to

arguments of counsel presented at the hearing, for the reasons explained herein, the Court will **GRANT** Defendants' Motions to Dismiss **without leave to amend** and will **DENY** Defendant Cal Regional MLS's Motion to Strike **as moot**.

## II. **BACKGROUND**[5]

Transactions for the sale of residential real estate involve a seller and a buyer who are typically each represented by a real estate professional.[6]  Real estate professionals are licensed real estate brokers and agents.[7]  Agents have the most direct relationship with the consumer; they solicit listings, work with sellers to market their homes, and work with buyers to find homes that match the buyers' preferences.[8]  Brokers supervise agents and often provide branding, advertising, and other services that help agents attract sellers and buyers and complete transactions.[9]  Brokers and agents compete between and among

---

Dismiss (the "Bright MLS & Midwest RED Reply") [ECF No. 64]; (7) Def. Cal Regional MLS' Reply in Supp. of Mot. to Dismiss (the "Cal Regional MLS Reply") [ECF No. 65]; (8) Def. NAR's Reply in Supp. of Mot. to Dismiss (the "NAR Reply") [ECF No. 66]; (9) Def. Cal Regional MLS' Reply in Supp. of Motion to Strike [ECF No. 67]; (10)  Pl.'s Notice of Suppl. Authority in Supp. of Opposition [ECF No. 71]; (11) Suppl. Brief in Supp. of the Motions (the "Defs.' Suppl. Brief") [ECF No. 83]; (12) Suppl. Brief in Supp. of the Opposition (the "Pl.'s Suppl. Brief") [ECF No. 84]; (13) Pl.'s Notice of Suppl. Authority [ECF No. 86] and Pl.'s Ex. to Suppl. Authority. [ECF No. 87]; and (14) Def. NAR's Notice of Resp. to Pl.'s Suppl. Authority (including its attachments) [ECF No. 88].

[5]     The Court assumes the truth of the factual allegations in PLS's Amended Complaint solely for the purpose of deciding the Motions.  The Court restates PLS's allegations for context, but it makes no determination regarding their veracity at this stage of the case.  *See, e.g.*, *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996) (on a motion to dismiss for failure to state a claim, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party").

[6]     Amended Complaint ¶¶ 27 & 28.

[7]     *Id.* at ¶ 27.

[8]     *Id.*

[9]     *Id.*

themselves to provide residential real estate brokerage services to home sellers and buyers.[10]

### A.    The MLS Defendants and NAR

Most residential real property for sale in the United States is marketed through a multiple listing service ("MLS") platform.[11]  MLSs are joint ventures among, in effect, their members:  licensed real estate professionals doing business in a particular local or regional area.[12]  Real estate professionals pay for membership and, therefore, access to an MLS, and those professionals must adhere to any restrictions that the MLS imposes.[13]  An MLS combines its members' home sale listings information into a central database and then makes the listing data available to all of its members.[14]  Listing a property on an MLS enables a home seller's professional to market the property to a large set of potential buyers.[15]  Correspondingly, a professional who represents a buyer can search an MLS for listed homes in the area that match the buyer's preferences.[16]

The value of the network services provided by an MLS is largely a function of the number of members within the network.[17]  That is, the greater the number of members in the MLS, the greater the number of listings on the MLS, which increases the value of membership.[18]  Bright MLS, Cal Regional MLS, and Midwest RED are each regional MLSs:  Bright MLS serves the Mid-

---

[10]    *Id.* at ¶ 32.
[11]    *Id.* at ¶ 1.
[12]    *Id.* at ¶ 32 & 34.
[13]    *Id.* at ¶ 32.
[14]    *Id.*
[15]    *Id.*
[16]    *Id.*
[17]    *Id.* at ¶ 50 & 51.
[18]    *Id.* at ¶¶ 32, 50, & 51.

Atlantic region;[19] Cal Regional MLS serves California;[20] and Midwest RED serves areas in the Upper Midwest.[21]

NAR is a trade association with more than 1.4 million individual members who are organized into 54 state and territorial associations and more than 1,200 local associations (the "Realtor Associations").[22]  NAR establishes and promulgates policies and professional standards for its individual members and for its Realtor Associations.[23]  Most real estate professionals in the U.S. are NAR members.[24]  Realtor Associations are required to adopt the rules and polices promulgated by NAR and to enforce those rules on the real estate professionals comprising the associations.[25]  Those policies include NAR's Handbook on Multiple Listing Policy.[26]

**B.   The NAR-Affiliated MLS System**

There are around 600 MLSs nationwide that are affiliated with NAR through their ownership or operation by NAR's Realtor Associations (the "NAR-affiliated MLSs").[27]  NAR-affiliated MLSs are required to adopt new or amended NAR policies.[28]  All NAR-affiliated MLSs are actual or potential

---

[19]    *Id.* at ¶ 19 (Bright MLS is owned and controlled by NAR members throughout the states of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia; the Commonwealth of Virginia; and the District of Columbia).

[20]    *Id.* at ¶ 18 (Cal Regional MLS "is the largest MLS in the United States with over 100,000 members who have access to more than 70[%] of the listings for sale in California").

[21]    *Id.* at ¶ 20 (Midwest RED serves northern Illinois, southern Wisconsin, and northwest Indiana, with over 45,000 members).

[22]    *Id.* at ¶ 17.  "Realtor" is a registered trademark of NAR.

[23]    *Id.* at ¶¶ 30 & 33.

[24]    *Id.* at ¶ 29.

[25]    *Id.* at ¶ 30.

[26]    *Id.* at ¶ 33.

[27]    *Id.* at ¶¶ 2 & 33.

[28]    *Id.* at ¶ 35.

competitors with other NAR-affiliated MLSs.[29]  Bright MLS and Cal Regional MLS are NAR-affiliated MLSs,[30] while Midwest RED is indirectly owned and controlled by NAR members.[31]  Real estate professionals are not required to be NAR members to participate in NAR-affiliated MLSs.[32]  Consequently, many real estate professionals who are not NAR members participate in NAR-affiliated MLSs[33]

The majority of NAR-affiliated MLSs are for-profit entities that charge membership fees for access to their services.[34]  For years, NAR-affiliated MLSs have enjoyed a high market share across the country.[35]

**C.    Pocket Listings**

MLSs generally impose specific requirements for their members' entry of listing data regarding residential real properties.  Sometimes, for a variety of reasons (including privacy), sellers of residential real property want to avoid providing all of the information required to market a listing through an MLS.  A seller with those interests might ask her real estate professional to market the listing by other means, outside of an NAR-affiliated MLS system.  An off-MLS listing service is referred to as a "pocket listing."[36]  A pocket listing allows a seller to customize and to limit the amount of information that she provides about her home, and, in this way, a pocket listing affords a seller with a level of privacy and discretion that is not available with an MLS listing.[37]  Historically,

---

[29]     *Id.* at ¶ 40.

[30]     *Id.* at ¶¶ 18 & 19.

[31]     *Id.* at ¶ 20.

[32]     *Id.* at ¶ 34.

[33]     *Id.*

[34]     *Id.* at ¶ 39.

[35]     *Id.* at ¶ 38.

[36]     *Id.* at ¶ 7.

[37]     *Id.* at ¶¶ 6 & 61.

-6-

pocket listings were marketed bilaterally by real estate professionals—"face to face, through phone calls, or by email."[38]

PLS was created in 2017 in response to consumer demand for a centralized, nationwide searchable repository for pocket listings.[39]  Like an MLS, membership in PLS is available to all licensed real estate professionals who pay a membership fee.  But unlike the many regionally-based MLSs, each of which charges its own membership fee, PLS charges a single fee to access its nationwide network.[40]  By joining PLS, real estate professionals can privately share pocket listings in cooperation with other members while avoiding the exposure of those listings through the NAR-affiliated MLSs.[41]  Also unlike MLS listings, PLS offers sellers the ability to share as much or as little information about their property as they desire.[42]  In sum, PLS's business model combines the network efficiencies of an MLS with the privacy and discretion of the pocket listing on a national—as opposed to a local or regional—platform.[43]

**D.    The Clear Cooperation Policy**

    **1.    Definition**

On November 11, 2019, NAR adopted its "Clear Cooperation Policy."[44]  The text of the Clear Cooperation Policy is as follows:

> Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants.  Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing

---

[38]    *Id.* at ¶ 8.
[39]    *Id.* at ¶¶ 8 & 58.
[40]    *Id.* at ¶¶ 59, 60, 63, & 64.
[41]    *Id.* at ¶ 8.
[42]    *Id.* at ¶ 61.
[43]    *Id.* at ¶¶ 12 & 61.
[44]    *Id.* at ¶¶ 86–90.

on public facing websites, brokerage website displays . . ., digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public.[45]

NAR created an exception to its Clear Cooperation Policy for so-called "office listings," which are listings marketed entirely within a brokerage firm without submission to an MLS.[46]  The Clear Cooperation Policy became effective on January 1, 2020, and it was included as a mandatory rule in the 2020 NAR Handbook on Multiple Listing Policy.[47]  NAR-affiliated MLSs enforce Clear Cooperation by monitoring members' adherence to the policy, by encouraging members to report violations, and by threatening or imposing penalties on members for non-compliance.[48]

## 2.   History and Adoption

In the months leading up to NAR's adoption of the Clear Cooperation Policy, the MLS Defendants privately and publicly coordinated with NAR, which has a national footprint, to formulate Clear Cooperation as a method to stamp out pocket listings.[49]  The collusion between the MLS Defendants and NAR began in August 2019 at a meeting of NAR's MLS Technology and Emerging Issues Advisory Board.[50]  PLS alleges, on information and belief, that a representative of Midwest RED was present at this meeting as a representative of the Council of Multiple Listing Services (the "MLS Council").[51]  The NAR

---

[45]    *Id.* at ¶ 89.

[46]    *Id.* at ¶ 93.

[47]    *Id.* at ¶ 90.  NAR-affiliated MLSs, including Bright MLS and Cal Regional MLS, were required to modify their rules by May 1, 2020, to conform to the Clear Cooperation Policy.  *Id.*

[48]    *Id.* at 94.

[49]    *See id.* at ¶¶ 69–86.

[50]    *Id.* at ¶ 71.

[51]    *Id.*

1    Technology and Emerging Issues Advisory Board ultimately voted to

2    recommend a version of what would become the Clear Cooperation Policy.[52]

3          In September 2019, the MLS Defendants were among the signatories of a

4    white paper that called for action against the threat of pocket listings.[53]  On

5    October 16, 2019, Bright MLS adopted a policy similar to the Clear Cooperation

6    Policy, which (as discussed above) NAR adopted the next month.[54]  Around the

7    same time, Midwest RED published a statement supporting the adoption of the

8    Clear Cooperation Policy at NAR's upcoming convention.[55]  On October 17 and

9    18, 2019, the MLS Defendants met at an MLS Council conference.[56]  The CEO

10   of Midwest RED and the Chairman of Bright MLS each made statements at the

11   conference to address the purported threat of pocket listings to the MLS

12   business model.  Midwest RED's CEO discussed Midwest RED's pocket listing

13   policy,[57] and Bright MLS's Chairman advocated for the adoption of similar

14   policies—including the policy that eventually became Clear Cooperation—and

15   encouraged participants to attend the upcoming NAR convention.[58]

16                              **III.  LEGAL STANDARD**

17   **A.    Motions to Dismiss**

18         A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

19   Procedure tests the legal sufficiency of the claims asserted in a complaint.

20   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  In ruling on a Rule 12(b)(6)

21   motion, "[a]ll allegations of material fact are taken as true and construed in the

22   light most favorable to the nonmoving party."  *Am. Family Ass'n v. City &*

---

[52]    *Id.*

[53]    *Id.* at ¶ 75.

[54]    *Id.* at ¶ 76.

[55]    *Id.* at ¶ 77.

[56]    *Id.* at ¶ 78.

[57]    *Id.* at ¶ 79.

[58]    *Id.* at ¶¶ 80–85.

1  *County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir. 2002). Although a

2  complaint attacked through a Rule 12(b)(6) motion "does not need detailed

3  factual allegations," a plaintiff must provide "more than labels and

4  conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

5  To state a plausible claim for relief, the complaint "must contain

6  sufficient allegations of underlying facts" to support its legal conclusions. *Starr*

7  *v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). "Factual allegations must be

8  enough to raise a right to relief above the speculative level on the assumption

9  that all the allegations in the complaint are true (even if doubtful in fact) . . . ."

10 *Twombly*, 550 U.S. at 555 (citations and footnote omitted). Accordingly, to

11 survive a motion to dismiss, a complaint "must contain sufficient factual matter,

12 accepted as true, to state a claim to relief that is plausible on its face," which

13 means that a plaintiff must plead sufficient factual content to "allow[] the Court

14 to draw the reasonable inference that the defendant is liable for the misconduct

15 alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks

16 omitted). A complaint must contain "well-pleaded facts" from which the Court

17 can "infer more than the mere possibility of misconduct." *Id.* at 679.

18 **B.   Leave to Amend**

19 Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to

20 amend "shall be freely granted when justice so requires." The purpose

21 underlying the amendment policy is to "facilitate decision on the merits, rather

22 than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127

23 (9th Cir. 2000). Leave to amend should be granted unless the Court determines

24 "that the pleading could not possibly be cured by the allegation of other facts."

25 *Id.* (quoting *Doe v. United States*, 8 F.3d 494, 497 (9th Cir. 1995)).

26 **IV.  DISCUSSION**

27 PLS argues that, by promulgating and adopting the Clear Cooperation

28 Policy, Defendants engaged in an unreasonable restraint of trade in violation of

-10-

1  § 1 of the Sherman Act and California's Cartwright Act.[59]  To assess the

2  plausibility of PLS's claims, it is necessary first to take note of the applicable

3  antitrust principles and the elements that PLS must plead to state a claim.  *See*

4  *Iqbal*, 556 U.S at 675; *Twombly*, 550 U.S. at 553–54.

5  **A.    PLS's Claim Under § 1 of the Sherman Act**

6      Section 1 of the Sherman Act provides that "[e]very contract,

7  combination in the form of trust or otherwise, or conspiracy, in restraint of trade

8  or commerce among the several States, or with foreign nations, is declared to be

9  illegal." 15 U.S.C. § 1.  "Congress designed the Sherman Act as 'a consumer

10 welfare prescription.'"  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 343 (1979)

11 (quoting R. BORK, THE ANTITRUST PARADOX 66 (1978)).  Key concepts

12 underlying antitrust law include the notion that when economic resources are

13 allocated to their best use, and when competitive price and quality are assured to

14 the consumer, consumer welfare is maximized.  *See Rebel Oil Co. v. Atl. Richfield*

15 *Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *accord National Gerimedical Hosp. and*

16 *Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 387–88 & n.13 (1981).

17 Thus, "an act is deemed anticompetitive under the Sherman Act only when it

18 harms both allocative efficiency and raises the prices of goods above competitive

19 levels or diminishes their quality."  *Id.*  Accordingly, the Supreme Court has

20 repeatedly emphasized that in enacting the Sherman Act, "Congress intended to

21 outlaw only unreasonable restraints" on trade or commerce.  *Texaco Inc. v.*

22 *Dagher*, 547 U.S. 1, 5 (2006) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10

23 (1997)).

24     Restraints can be unreasonable for antitrust purposes in one of two ways.

25 Some restraints are unreasonable *per se* because they "always or almost always

26 tend to restrict competition and decrease output."  *Broadcast Music, Inc. v.*

27

28 [59]    *Id.* at ¶¶ 123 & 126.

1   *Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 19-20 (1979); *see also Ohio v.*

2   *American Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("*Amex*").  If the challenged

3   restraint is not unreasonable *per se*, then the restraint is judged under the Rule of

4   Reason.  *Id.* at 2284.

5       Most antitrust claims are analyzed under the Rule of Reason.  *See State*

6   *Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  The goal of the Rule of Reason analysis is

7   to "distinguis[h] between restraints with anticompetitive effect that are harmful

8   to the consumer and restraints stimulating competition that are in the

9   consumer's best interest."  *Id.* (quoting *Leegin Creative Leather Products, Inc. v.*

10   *PSKS, Inc.*, 551 U.S. 877, 886 (2007)).  To state a § 1 claim under the Rule of

11   Reason, a plaintiff must plead sufficient facts to show the plausible existence of

12   "(1) a contract, combination or conspiracy among two or more persons or

13   distinct business entities; (2) by which the persons or entities intended to harm

14   or restrain trade or commerce among the several States, or with foreign nations;

15   (3) which actually injures competition."  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d

16   1042, 1047 (9th Cir. 2008).  In addition, a plaintiff must also plead (4) that it was

17   harmed by the unlawful anti-competitive restraint and that such harm flowed

18   from an "anti-competitive aspect of the practice under scrutiny."  *Atl. Richfield*

19   *Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).  The latter element is

20   referred to as an "antitrust injury."  *Brantley v. NBC Universal, Inc.*, 675 F.3d

21   1192, 1197 (9th Cir. 2012); *accord Atl. Richfield*, 4985 U.S. at 334.

22       The underlying goal of the *per se* rule and the Rule of Reason is,

23   ultimately, the same; both "'are employed "to form a judgment about the

24   competitive significance of the restraint."' [Citation.] '[W]hether the ultimate

25   finding is the product of a presumption or actual market analysis, the essential

26   inquiry remains the same—whether or not the challenged restraint enhances

27   competition.'"  *Atl. Richfield*, 495 U.S. at 342 n.12 (internal citations omitted).

28   In this regard, the antitrust injury requirement is paramount.  "The antitrust

1   injury requirement ensures that a plaintiff can recover only if the loss stems from

2   a competition-***reducing*** aspect or effect of the defendant's behavior." *Id.* at 341

3   (emphasis in original).

4       1.  <u>**Antitrust Injury**</u>

5       Standing is a "threshold question in every federal case;" it implicates

6   "the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490,

7   498 (1975) ("the question of standing is whether the litigant is entitled to have

8   the court decide the merits of the dispute or of particular issues").  In private

9   antitrust cases, the plaintiff is required to make plausible allegations regarding

10  both ***constitutional standing*** and ***antitrust standing***.  *See Associated Gen.*

11  *Contractors of Calif., Inc. v. Calif. State Council of Carpenters*, 459 U.S. 519, 535

12  n.31 (1983).  In the constitutional dimension, standing requires justiciability:

13  that "the plaintiff has made out a 'case or controversy' between himself and the

14  defendant within the meaning of [Article] III." *Warth*, 422 U.S. at 498.  In most

15  antitrust cases, the "[h]arm to the antitrust plaintiff is sufficient to satisfy the

16  constitutional standing requirement of injury in fact." *Associated Gen.*

17  *Contractors*, 459 U.S. at 535 n.31.  But the standing inquiry does not end there.

18      In addition to the traditional constitutional limitations upon standing,

19  "Congress imposed . . . limitations upon those who can recover damages under

20  the antitrust laws." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1034 (9th

21  Cir. 2001); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,

22  485–86 (1977).  These limitations are often referred to as "antitrust standing

23  requirements." *Pool Water*, 258 F.3d at 1034.  Because § 1 of the Sherman Act

24  does not provide a private right of action, private parties like PLS must bring

25  their Sherman Act claim "pursuant to the authorization under [§] 4 of the

26

27

28

Clayton Act."[60]  *Id.*  Under that statute, "private plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent."  *Id.*; *see also Atl. Richfield*, 495 U.S. at 334 (the plaintiff must plausibly allege "the existence of 'antitrust injury.'" (quoting *Brunswick*, 429 U.S. at 489)).[61]

As a rule of standing, the "antitrust injury" requirement embodies the fundamental principle that antitrust laws "were enacted for 'the protection of **competition** not **competitors**'" *Brunswick Corp.*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)) (emphasis in original), because "'[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition," *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 109–110 (1986) (quoting *Brunswick*, 429 U.S. at 488).[62]  The Supreme Court has explained that "[t]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  In this regard, the antitrust injury requirement clarifies that the

---

[60]     PLS alleges that it has standing to assert its claim under § 1 of the Sherman Act pursuant to §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26. Amended Complaint ¶ 23.

[61]     "[A] plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. 544.

[62]     In *United States v. Topco Associates, Inc.*, 405 U.S. 596 (1972), the Supreme Court explained that "[a]ntitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise.  They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms.  And the freedom guaranteed each and every business, no matter how small, is the freedom to compete—to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster."  *Id.* at 610; *see also* William Page, *The Scope of Liability for Antitrust Violations*, 37 STAN. L. REV. 1445, 1451 (1985) ("most commentators now agree that the purpose of [antitrust] law is to maximize economic efficiency, or consumer welfare, by the preservation of competitive markets" (footnote omitted)).

1   Sherman Act is not directed against "conduct which is competitive, even

2   severely so, but against conduct which unfairly tends to destroy competition

3   itself . . . , out of concern for ***the public interest***." *Id.* (emphasis added).

4          Thus, even when a challenged restraint has the effect of eliminating a

5   rival, thereby reducing competition (at least with that rival), the elimination of a

6   rival without harm to consumer welfare does not invoke the Sherman Act. *See*

7   *Rebel Oil Co.*, 51 F.3d at 1433 (citing *Prods. Liab. Ins. Agency, Inc. v. Crum &*

8   *Forster Ins. Cos.*, 682 F.2d 660, 663 (7th Cir. 1982)); *see also Reiter*, 442 U.S. at

9   343.  A private antitrust plaintiff must allege a plausible connection between the

10  harm to itself and harm to the ultimate consumer. *See Atl. Richfield*, 495 U.S. at

11  340–42.  In sum, to allege a plausible antitrust injury, a private plaintiff must

12  allege facts that, assumed to be true, show that the plaintiff's injuries are caused

13  by an anticompetitive aspect of the defendant's conduct that also injures

14  competition and consumers. *See id.* at 334–35 & 342–44; *Rebel Oil Co.*, 51 F.3d

15  at 1445; *see also Cargill*, 479 U.S. at 109–110; *Brunswick*, 429 U.S. at 489.

16         Here, Defendants contend that PLS has not alleged facts plausibly to

17  demonstrate that PLS has suffered an antitrust injury and, therefore, that PLS

18  does not have standing as an antitrust plaintiff.  For the reasons explained below,

19  the Court agrees.

20         In analyzing the antitrust injury requirement in the context of this case,

21  one fundamental point informs the Court's analysis:  the distinction between, on

22  the one hand, a pocket listing as a particular service offered to home sellers by

23  real estate professionals, and, on the other hand, PLS's business, which provides

24  a platform for its members to market their pocket listings.  As described above, a

25  pocket listing, or an off-MLS listing, is a type of brokerage service provided by

26  real estate professionals to home sellers who, "for reasons of privacy or

27

28

security"[63] for example, wish to avoid providing the detailed information that is required for a listing to be submitted to, and marketed through, an NAR-affiliated MLS.[64]  PLS emerged as a platform for real estate professionals to market private listings to other members without having to provide the detailed listing information required by the NAR-affiliated MLSs, thus preserving the home seller's interest in not disclosing certain information about her listing.[65]

### a.   The Alleged Injury to PLS

To assess whether PLS states a plausible antitrust injury, the Court begins with PLS's allegations regarding how the Clear Cooperation Policy harms PLS's business.

PLS alleges that the Clear Cooperation Policy has "eliminated the ability and incentive of real estate professionals to market pocket listings through PLS,"[66] which has foreclosed PLS from accessing "a critical mass of listings necessary to obtain significant network effects and compete with the NAR-affiliated MLSs in the relevant market(s)."[67]  Consequently, listings were removed from PLS and submitted to NAR-affiliated MLSs, agent participation in PLS declined, and "PLS was foreclosed from the commercial opportunities necessary to innovate and grow."[68]  PLS claims damages in the form of "lost profits"[69] and "lost equity and goodwill,"[70] which "diminish[ed] the value of

---

[63]     Amended Complaint ¶ 6.  A seller might also desire a pocket listing in order "to test the market for their home without the stigma that comes from listing and then delisting the property on a NAR-affiliated MLS."  *Id.*

[64]     *Id.* at ¶¶ 6–8 & 61.

[65]     *Id.* at ¶¶ 8, 58–60, 63,& 64.

[66]     *Id.* at ¶ 112.

[67]     *Id.* at ¶ 113.

[68]     *Id.* at ¶ 121.

[69]     *Id.* at ¶ 124.

[70]     *Id.* at ¶ 125.

1   PLS as a going concern."[71]  PLS seeks injunctive relief and an award of

2   compensatory and treble damages.[72]

3       PLS's allegations in this regard are sufficient to meet the constitutional

4   requirement for injury-in-fact and the first element of antitrust injury.  PLS

5   plausibly alleges that the Clear Cooperation Policy effectively discourages real

6   estate professionals who are also members of an NAR-affiliated MLS from

7   marketing their listings on PLS's platform.  Those real estate professionals'

8   refusal to use PLS's platform necessarily harms PLS's business.  But this is only

9   the first element of antitrust injury—the constitutional dimension of the

10  standing inquiry.

11      Whether the Clear Cooperation Policy "may be properly characterized as

12  exclusionary" for the purpose of an antitrust injury cannot be answered simply

13  by considering its alleged effects on PLS.  *See Aspen Skiing Co. v. Aspen*

14  *Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985); *Brantley*, 675 F.3d at 1200

15  ("Plaintiffs may not substitute allegations of injury to the claimants for

16  allegations of injury to competition.").  The Court must also consider whether

17  PLS has alleged facts to show that the Clear Cooperation Policy harms

18  competition and consumers in the same way.  *See id.*; *Rebel Oil Co.*, 51 F.3d at

19  1445 ("because the Sherman Act's concern is consumer welfare, antitrust injury

20  occurs only when the claimed injury flows from acts harmful to consumers").

21          **b.    The Alleged Injury to Consumers**

22      In evaluating whether conduct can be properly characterized as

23  exclusionary, the Court must consider how the challenged restraint affects

24  consumers and "whether it has impaired competition in an unnecessarily

25  restrictive way."  *Aspen Skiing Co.*, 472 U.S. at 605.  In this regard,

26

27  ───────────────────
    [71]     *Id.* at ¶¶ 125 & 128.

28  [72]     *See id.* at Prayer for Relief.

-17-

1  "'exclusionary' comprehends at the most behavior that not only (1) tends to
2  impair the opportunities of rivals, but also (2) either does not further
3  competition on the merits or does so in an unnecessarily restrictive way." *Id.* at
4  605 n.32 (quoting 3 P. AREEDA & D. TURNER, ANTITRUST LAW 78 (1978))
5  (quotation marks omitted).

6      Thus, the second element of antitrust injury requires PLS to allege facts
7  showing a plausible injury to consumers that flows from an anticompetitive
8  aspect of Defendants' conduct; in this case, the alleged restraint on output
9  through the Clear Cooperation Policy that limits the ability of NAR members, or
10 members of an NAR-affiliated MLS, to compete to provide services to
11 consumers.[73]  *See Atl. Richfield*, 495 U.S. at 335–36, 338–40, & 342–44 (rejecting
12 the contention that "any loss flowing from a *per se* violation of § 1 automatically
13 satisfies the antitrust injury requirement" and explaining that antitrust injury
14 does not arise until "an ***anticompetitive*** aspect of the defendant's conduct"
15 injures both the plaintiff and consumers (emphasis in original)).  The Supreme
16 Court has explained that violations of the antitrust laws may have three, often
17 interwoven, effects:  "In some respects the conduct may reduce competition, in
18 other respects it may increase competition, and in still other respects effects may
19 be neutral as to competition." *Id.* at 344.  An antitrust injury does not arise,
20 however, unless and until the challenged restraint also injures consumers.  *Id.* at
21 335–36, 338–40, & 342–44.

22     PLS attempts to translate its own harm into harm to consumers by
23 alleging that the Clear Cooperation Policy injures real estate professionals (the
24 proximate purchasers of real estate listing network services) and home sellers
25 and buyers (the ultimate consumers) through the same "mechanism of injury"

26
27
28 [73]     *See* Opposition 27:1–13.

to PLS.[74]  Specifically, PLS avers that through the Clear Cooperation Policy, NAR "restrained the ability of licensed real estate professionals to offer" pocket listings, which purportedly harms consumers and competition by eliminating "from the market a form of real estate brokerage services desired by consumers,"[75] thus excluding PLS, and thereby artificially maintaining or increasing the prices paid by real estate professionals for listing services.[76]  The Court finds that these allegations do not show a ***plausible*** injury to the ultimate consumers—the home buyers and sellers.  Fatally, PLS's theory that the Clear Cooperation Policy is a restraint on the output of brokerage listing services to consumers is illogical, and, additionally, it is contradicted by the allegations that PLS makes elsewhere in its Amended Complaint.[77]  *See Iqbal*, 556 U.S at 675 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."); *Brantley*, 675 F.3d at 1198 ("a complaint's allegation of a practice that may or may not injure competition is insufficient to 'state a claim to relief that is plausible on its face.'" (quoting *Twombly*, 550 U.S. at 570)); *Kendall*, 518 F.3d at 1047–48.

PLS does not allege any facts showing when, where, or, notably, how the output of real estate brokerage services or off-MLS listing services has

---

[74]    Amended Complaint ¶ 122.

[75]    *Id.* at ¶ 115.

[76]    *Id.* at ¶¶ 115 & 122.

[77]    *Cf. id.* at ¶¶ 35–37, 88–91, & 106–115.  Citing these paragraphs, PLS succinctly summarizes its antitrust injury allegations as follows:  "By requiring third-party listing agents who wish to obtain the essential benefits of NAR membership to provide their listings to the MLS defendants, *id.* ¶¶ 35–37, 88–91, Clear Cooperation not only harms competition by reducing output and quality in the market for listing services, *id.* at ¶¶ 106–15, but in so doing, it 'cut[s] off' PLS's access to a supply, pocket real estate listings, that is 'necessary to enable the boycotted firm'—PLS—'to compete.'"  Pl.'s Suppl. Brief 7:1–7 (quoting *Nw. Wholesale Stat., Inc. v. Pac. Stat. & Print. Co.*, 472 U.S. 284, 294 (1985)).

-19-

decreased.[78]  Defendants and PLS provide different marketing platforms for those listings.  PLS does not adequately allege that the Clear Cooperation Policy has increased prices for services purchased or otherwise paid for by home sellers and buyers[79] or that home sellers and buyers have been denied brokerage services[80] that they desire as a result of the Clear Cooperation Policy.[81]  In the absence of any specific factual allegations to support PLS's conclusions regarding consumer harm, there is no plausible antitrust injury.

PLS's antitrust injury contention is fundamentally flawed in yet another respect.  PLS does not allege a plausible injury to participants on both sides of the market.  The real estate market is a typical two-sided market where different products or services are offered to two distinct groups of customers—home sellers and home buyers.  Listing platforms such as those provided by the MLS Defendants and PLS facilitate transactions by connecting sellers with potential buyers.[82]  *See Ohio v. American Express*, 138 S. Ct. 2274, 2280 (2018) ("a two-

---

[78]  *Cf.* Amended Complaint at ¶¶ 95, 111, 112, & 121 (listings were removed from PLS and submitted ***instead*** to NAR-affiliated MLSs, and NAR-affiliated MLSs continue to allow members to market off-MLS listings).

[79]  With respect to conspiracies to restrict output and how they injure consumers, *compare, e.g., In re National Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1155, 1157–58 (9th Cir. 2019) (allegations of conspiracy to restrict output of telecasts resulting in prices paid by the ultimate consumers being higher than they would be in the absence of the conspiracy were sufficient to allege antitrust standing), *with* Amended Complaint ¶¶ 114, 115, & 122; *see also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521–23 (2019).

[80]  PLS acknowledges that the market for real estate brokerage services is relevant to assess harm to competition and consumers.  Amended Complaint ¶ 115 (the Clear Cooperation Policy "harmed consumers and competition by eliminating from the market a form of real estate brokerage services desired by consumers").

[81]  *See Cal. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 776–77 (1999) (the relevant question is whether the challenged restraint obviously tends to limit the total delivery of services to the consumer); Amended Complaint ¶ 95 (NAR-affiliated MLSs continue to allow members to market off-MLS listings through private networks); *cf. Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Oklahoma*, 468 U.S. 85, 114–15 (1984) (plaintiffs alleged a reduction in overall output of services to consumers as a consequence of the challenged restraint).

[82]  *See* Amended Complaint at ¶ 31; *see also id.* at ¶¶ 19, 26, & 31 (explaining that the MLS Defendants "facilitate[ ]" real estate transactions).

sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them"); *see also* Evans & Noel, *Defining Antitrust Markets When Firms Operate Two–Sided Platforms*, 2005 COLUM. BUS. L. REV. 667, 668 (2005) ("members of one customer group need members of the other group").[83] *Amex* sets forth a pleading standard in antitrust cases involving two-sided platforms:  a plaintiff must allege (and later prove) injury to participants on both sides of the market.  *See Amex*, 138 S. Ct.  at 2287 ("Evaluating both sides of a two-sided transaction platform is . . . necessary to accurately assess competition."); *Iqbal*, 556 U.S. at 675.

Accordingly, PLS must allege a plausible injury to **both** home sellers **and home buyers**, which it has not done.  It is, perhaps, telling that PLS's allegations focus almost entirely on home sellers.  PLS makes no allegations regarding any demand for pocket listings by home buyers, no allegations explaining how pocket listings are beneficial to home buyers,[84] and no allegations regarding how the Clear Cooperation Policy harms home buyers.  PLS's failure to address the buyer's side of the market is not surprising given that the alleged inherent

---

[83]    *Compare* Amended Complaint ¶¶ 50 & 51 (discussing the value of network services offered by MLSs), *with* Evans & Noel, *supra*, at 686–87 (indirect network effects promote larger and fewer two-sided platforms because "[p]latforms with more customers in each group are more valuable to the other group").

[84]    *Cf. id.* at ¶ 8.  PLS alleges that its platform benefits buyers by offering them an opportunity to learn about properties that were not widely marketed.  This allegation, however, does not explain how buyers are otherwise benefited by off-MLS listings.  According to PLS's allegations, PLS effectively offers buyers the same basic benefit as an MLS (an opportunity to learn about properties on the market), but without the other efficiencies that are created by increased information and competition (mostly through information sharing on an MLS), as explained above.  Indeed, one of the most important market efficiencies created by an MLS "is manifested in the reduction of the obstacles brokers must face in adjusting supply to demand:  market imperfections are overcome in that information and communication barriers are reduced, along with the easing of the built-in geographical barrier confronting the buyer-seller relationship.  Moreover, a realistic price structure is engendered."  Arthur D. Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 COLUM. L. REV. 1325, 1329 (1970), *cited with approval in U.S. v. Realty Multi-List, Inc.*, 629 F.3d 1351, 1356 (5th Cir. 1980).

advantages of a pocket listing—*e.g.*, increased privacy and security for a seller to market his home without the wide exposure of the MLS and the avoidance of the stigma from listing and then delisting a property from the MLS[85]—appear to benefit the seller, almost exclusively.  In contrast, home buyers stand to benefit from an increase in available information about the market (which increases price competition), not from a reduction in the provision of such information.

PLS simply has not alleged plausible facts to show an injury to consumers on both sides of the market.  These fundamental problems, taken together, show that PLS cannot allege a plausible antitrust injury.

### c. <u>The Alleged Injury to Competition</u>

On its face, the Clear Cooperation Policy does not preclude real estate professionals from offering pocket listing services, nor does it preclude them from marketing their listings on PLS.  Furthermore, there is no plausible inference from the alleged facts that the Clear Cooperation Policy has any such restrictive effect on the output of brokerage services to consumers.  PLS does not allege any facts to show that real estate professionals have stopped (or will stop) offering pocket listings, or other types of listing services, when those services are demanded by consumers.[86]  To the contrary, sellers who desire to avoid listing their properties on an MLS may do so, for example, by working with an NAR-affiliated MLS member through the office exclusive exception[87] or by engaging a real estate professional who does not belong to an NAR-affiliated

---

[85]     *Id.* at ¶ 6.

[86]     *Cf.* Amended Complaint ¶ 115 (suggesting the opposite, *i.e.*, that real estate professionals will presumably continue to compete to provide pocket listings as they have before).

[87]     The office exclusive exception is significant.  PLS alleges that the presence of large brokerages operating across the nation increased demand for a nationwide listing network.  *See id.* at ¶¶ 46, 48, & 49.  Surely, then, marketing a private listing within a large nationwide brokerage under the office exclusive exception provides significant exposure of the property in an off-MLS setting.  This is important in evaluating whether the Clear Cooperation Policy has the plausible effect of reducing output of services to consumers.  It does not.

MLS.[88]  Moreover, the plain text of the policy does not proscribe real estate professionals from marketing pocket listings in the same way as they have previously:  "bilaterally . . . , face to face, through phone calls, or by email."[89]  Furthermore, the Clear Cooperation Policy does not proscribe real estate professionals from making a choice about the listing network platforms in which they choose to participate.  Of equal importance, consumers are not deprived of any choice in products or services.

Indeed, accepting PLS's allegations as true, the Clear Cooperation Policy has some plainly pro-competitive aspects, which underscore that PLS cannot allege a plausible connection between harm to its business and harm to competition and consumers.  *See F.T.C. v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986) (in some cases, anticompetitive effects, or their absence, can be logically inferred based upon a rudimentary understanding of economics).  At worst, the Clear Cooperation Policy is neutral to competition.  And when a challenged restraint is beneficial or neutral to competition, "there is no antitrust injury, **even if** the defendant's conduct is illegal *per se*."  *Rebel Oil Co.*, 51 F.3d at 1433 (emphasis added).

The Clear Cooperation Policy requires listings that are publicized by a member of an NAR-affiliated MLS to be reciprocally listed on an MLS for exposure to other MLS members.[90]  This means that all MLS members have access to information about listings that are publicly marketed by other MLS

---

[88]    *Id.* at ¶ 95 (since the adoption of the Clear Cooperation Policy, NAR-affiliated MLSs have "effectively allow[ed] their members to market off-MLS listings under the auspices of the NAR-affiliated MLSs without violation of . . . Clear Cooperation Policy"); *see also id.* at ¶¶ 89, 93, & 115–17 (implicitly recognizing that the Clear Cooperation Policy has not resulted in a decrease in overall output of services to consumers).

[89]    *Id.* at ¶ 8; *see also id.* at ¶ 95.

[90]    *Id.* at ¶ 89; *see also id.* at ¶¶ 32, 50, & 51 (explaining the inherent benefits of MLS membership, and that the value of membership in an MLS is a function of the contributions of the MLSs members).

members, which ultimately promotes competition among real estate professionals and home sellers and buyers.[91]  Basic economics dictates that increased information about market conditions stimulates more competition among real estate professionals, whose goal is, at least in part, to match a buyer and a seller as quickly and efficiently as possible.  This effect minimizes transaction costs.  Consumers also have access to more information regarding market conditions, enabling them to make better informed choices about the bundle of real estate brokerage services that will best serve their needs.

Although the Clear Cooperation Policy may harm PLS by discouraging the use of PLS's platform,[92] that injury to PLS's business model does not translate to consumer harm.  Notably, PLS alleges that the Clear Cooperation Policy results in, among other things, listings being "removed from PLS and submitted instead to NAR-Affiliated MLSs."[93]  Shifting sales to "other competitors in the market," however, "does not directly affect consumers and therefore does not result in antitrust injury."  *Pool Water Prods.*, 258 F.3d at 1036.  Indeed, based upon this allegation (and others like it),[94] it is evident that the Clear Cooperation Policy does not reduce the output of brokerage services to home sellers and buyers, nor does the policy reduce competition among the real estate professionals who provide services to consumers.  *Compare Cal. Dental Ass'n*, 526 U.S. at 776–77 (no reduction in overall output of services to consumers), *and Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 21–24 (1979) (to similar effect), *with Sunday Ticket Antitrust Litig.*, 933 F.3d at 1155 (the challenged restraint plausibly reduced the overall output of services to consumers by restricting games available for viewing).

---

[91]     *Id.* at ¶ 89; *see also id* at ¶¶ 32, 50, 51, & 95.

[92]     *Id.* at ¶¶ 111 & 112.

[93]     *Id.* at ¶ 121.

[94]     *See, e.g., id.* at ¶¶ 95, 108, & 121.

2.   **Leave to Amend**

In sum, based upon the foregoing, the Court finds that PLS fails to allege a plausible antitrust injury, so it will grant Defendants' Rule 12(b)(6) Motions. PLS requests leave to amend.[95]  The Court, however, finds that another amendment of the complaint would be futile, for two reasons.

First, the parties' substantive meet-and-confer efforts already resulted in PLS's filing of the Amended Complaint, and PLS declined to amend its pleading a second time.[96]  *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1133 (9th Cir. 2013) (a district court has "particularly broad" discretion to deny leave to amend where the plaintiff has previously amended).  Second, under these circumstances, an amended complaint must allege "other facts consistent with the challenged pleading" that could "cure the deficiency."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  In view of the fundamental problems with PLS's theory of antitrust injury discussed above, the Court finds that the complaint cannot be saved by amendment.  *See Steckman v. Hart Brewing*, 143 F.3d 1293, 1298 (9th Cir. 1998) ("Although there is a general rule that parties are allowed to amend their pleadings, it does not extend to cases in which any amendment would be an exercise in futility or where the amended complaint would also be subject to dismissal.") (citations omitted).

Accordingly, the Court will **GRANT** Defendants' respective Motions, **without leave to amend**.

---

[95]    *See* Opposition 37:26–27.

[96]    *See* NAR Motion 20:4–14; NAR Reply 15:11–16.

**3.**      <u>**The Remaining Elements of PLS's Claim Under § 1 of the**</u>
            <u>**Sherman Act**</u>

     With respect to Defendants' other arguments for the dismissal of PLS's Amended Complaint, the Court would grant the motion by Midwest RED for the reasons set forth below.

     As stated in the preceding sections, to state a § 1 claim, a plaintiff must plead facts showing the plausible existence of "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall*, 518 F.3d at 1047.

     With respect to the first element, the Court would find that PLS sufficiently alleges concerted action by Defendants Bright MLS, Cal Regional MLS, and NAR.  NAR promulgated the Clear Cooperation Policy, *see Alvord-Polk, Inc. v. Schumacher Co.*, 37 F.3d 996, 1007 (3d Cir. 1994) (a trade association's adoption of regulations that govern competition between members is sufficient to plead concerted action); *see also Silver v. N.Y. Stock Exchange*, 373 U.S. 341 (1963), and Bright MLS and Midwest RED, as NAR-affiliated MLSs,[97] were obligated to adopt the Clear Cooperation Policy by May 1, 2020, pursuant to the 2020 NAR Handbook on Multiple Listing Policy,[98] *see, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 286-87 (4th Cir. 2012) (MLS rules are concerted action under § 1); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d at 1150; *Realty Multi-List*, 629 F.2d at 1361 & n.20.  Although the Amended Complaint does not allege that Bright MLS and Cal Regional MLS ultimately adopted the Clear Cooperation Policy, PLS's allegation that Bright MLS and

---

[97]      *Id.* at ¶¶ 18 & 19.

[98]      *Id.* at ¶ 90; *see also id.* at ¶¶ 103–105.

Cal Regional MLS were required to do so supports a plausible inference that they did.[99]  At this stage of the litigation, such allegations are sufficient to plead concerted action under § 1.

PLS does not, however, allege facts plausibly to show that Midwest RED was part of the alleged conspiracy.  Notably, Midwest RED is not an NAR-affiliated MLS, and PLS does not allege that Midwest RED adopted the Clear Cooperation Policy.  PLS merely alleges that Midwest RED participated in private communications about the Clear Cooperation Policy through the MLS Council, voiced support for the Clear Cooperation Policy, and was present for a vote recommending that NAR adopt the Clear Cooperation Policy at a later date.[100]  These are allegations of parallel business conduct; they are not sufficient to establish Midwest RED's participation in the alleged conspiracy because such allegations do not give rise to a plausible inference that Midwest RED ever reached an agreement with the other MLS Defendants or NAR regarding the Clear Cooperation Policy.  *Twombly*, 550 U.S. at 553–554 (allegations of parallel business behavior, even "conscious parallelism," falls short of establishing an agreement constituting a Sherman Act offense); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) (to similar effect).  Moreover, PLS's conclusory allegation that Midwest RED is a competitor with the other MLS Defendants is not plausible, given that each of the MLS Defendants serves a different geographic market.[101]

---

[99]     *See id.* at ¶¶ 68–94, 102, & 104–05.

[100]    *Id.* at ¶¶ 71, 73–74, 77–79, & 86.

[101]    The Court would not make any such finding with respect to the NAR-affiliated MLS Defendants because PLS's allegation that the NAR-affiliated MLSs were obligated to adopt the Clear Cooperation Policy is sufficient to plead concerted action, as explained above.  Thus, the question with respect to Bright MLS and Cal Regional MLS is whether they were competitors with each other, and competitors with PLS in a national market.  The Court would find that this is a question of fact not suitable for resolution on a motion to dismiss.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044–45 (9th Cir. 2015).

Putting aside, for the moment, the Court's analysis and conclusion with respect to the element of antitrust injury, the Court would otherwise find that PLS has alleged facts plausibly to show that the Clear Cooperation Policy is a *prima facie* unreasonable restraint of trade under the Rule of Reason framework.[102] *See Indiana Fed. Of Dentists*, 476 U.S. at 459–62 (agreement to limit services offered to consumers requires a procompetitive justification under the Rule of Reason); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1150–51 (9th Cir. 2019) (same); *Newcal Indus.*, 513 F.3d at 1044–45 (there is no requirement that a plaintiff allege the defendants' power within the relevant market with specificity, and "relevant market" element is typically a factual element); *Rebel Oil Co.*, 51 F.3d at 1433–35.  Whether PLS would ultimately prevail under the Rule of Reason framework necessarily would involve questions of fact—such as the procompetitive justifications offered by Defendants and the market power of the respective Defendants—that would not be appropriate for resolution at this stage of the litigation.

**B.    PLS's Claim under the Cartwright Act**

Claims under § 1 of the Sherman Act and claims under the Cartwright Act are analyzed under the same legal standard.  *See name.space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1131 n.5 (9th Cir. 2015); *City of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).  Accordingly, the Court's analysis of and conclusion regarding, PLS's claim under § 1 of the Sherman Act are dispositive of PLS's claim under the Cartwright Act.

## V.    CONCLUSION

Based upon the foregoing, the Court will enter an Order **GRANTING** Defendants' respective Motions to Dismiss, **without leave to amend**, on the

---

[102] *See* Amended Complaint at ¶¶ 1–15, 28–32, 38–41, 46–51, 94–101, & 106–116.

ground that PLS fails to allege a plausible antitrust injury.  The Court will also **DENY** Cal Regional MLS's Motion to Strike **as moot**, in view of its ruling on the Motions to Dismiss.

Dated:  February 3, 2021

John W. Holcomb
UNITED STATES DISTRICT JUDGE