**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE PLS.COM, LLC, a California limited liability company, *Plaintiff-Appellant*, | No. 21-55164 |
| | D.C. No. 2:20-cv-04790-JWH-RAO |
| v. | |
| THE NATIONAL ASSOCIATION OF REALTORS; BRIGHT MLS, INC.; MIDWEST REAL ESTATE DATA, LLC; CALIFORNIA REGIONAL MULTIPLE LISTING SERVICE, INC., *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Central District of California
John W. Holcomb, District Judge, Presiding

Argued and Submitted January 14, 2022
Pasadena, California

Filed April 26, 2022

Before: MILAN D. SMITH, JR. and JOHN B. OWENS,
Circuit Judges, and STEPHEN J. MURPHY, III,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Stephen Joseph Murphy, III, United States District Judge for the Eastern District of Michigan, sitting by designation.

## SUMMARY**

### Antitrust

The panel reversed the district court's dismissal of an action brought by The PLS.com, LLC, alleging that its competitors in the real estate network services market violated antitrust laws because they conspired to take anticompetitive measures to prevent PLS from gaining a foothold in the market, and remanded for further proceedings.

PLS challenged the National Association of Realtors' Clear Cooperation Policy, which required members of an NAR-affiliated multiple listing service who chose to list properties on the PLS real estate database also to list those properties on an MLS.  The district court dismissed on the ground that PLS did not, and could not, adequately allege antitrust injury under § 1 of the Sherman Act or California's Cartwright Act because it did not allege harm to home buyers and sellers.

A competitor has standing to assert a Sherman Act claim only when the claimed injury flows from acts harmful to consumers.  The panel held that the definition of the term consumer is not limited to one who buys goods or services for personal, family, or household use, with no intention of resale.  Rather, a business that uses a product as an input to create another product or service is a consumer of that input for antitrust purposes and can allege antitrust injury.  Accordingly, PLS was not required to allege harm to home

_____

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

buyers and sellers to allege antitrust injury, and its allegation that the Clear Cooperation Policy harmed buyers' and sellers' real estate agents, the consumers of PLS's and the MLSs' listing network services, could suffice.

To allege antitrust injury, PLS was required to allege unlawful conduct, causing injury to PLS, that flowed from that which made the conduct unlawful, and that was of the type that the antitrust laws were intended to prevent. Without a violation of the antitrust laws, there can be no antitrust injury.

The panel held that PLS adequately alleged a violation of Sherman Act § 1, which prohibits a contract, combination, or conspiracy that unreasonably restrains trade.  The panel held that PLS adequately alleged that the Clear Cooperation Policy was an unreasonable restraint of trade because it was a per se group boycott, but the panel left to the district court to determine in the first instance whether it should apply per se or rule of reason analysis at later stages in the litigation. The panel held that PLS satisfied *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) (*Amex*), which requires a plaintiff to define the relevant market to include both sides of the market in certain circumstances. The panel held that *Amex* can apply at the pleading stage, and that because PLS satisfied *Amex* by alleging injury to both sellers' agents and buyers' agents, the panel need not resolve the more difficult questions the parties raised about how broadly *Amex* applies.

The panel concluded that PLS adequately alleged antitrust injury by alleging a group boycott in which the Clear Cooperation Policy prevented PLS from gaining a foothold in the market and made it virtually impossible for new competitors to enter the market, leaving agents with fewer choices, supra-competitive prices, and lower quality products.

The panel held that it had jurisdiction to consider whether PLS adequately alleged that defendant Midwest Real Estate Date, LLC ("MRED") was involved in the alleged conspiracy. At the time of PLS's appeal, Federal Rule of Appellate Procedure 3(c)(1)(B) required a party to "designate" in its notice of appeal "the judgment, order, or part thereof being appealed." PLS's notice of appeal identified the object of its appeal as Subsection 1 of the district court's dismissal order, addressing antitrust injury, but PLS's opening brief also challenged Subsection 3 of the order, addressing whether PLS adequately alleged that MRED was part of the conspiracy. The panel held that it had jurisdiction to review Subsection 3 because PLS's intent to appeal Subsection 3 could be fairly inferred from its opening brief, and defendants were not prejudiced because they fully briefed the issue. The panel further held that PLS adequately alleged that MRED was involved in the conspiracy by alleging a conscious commitment to a common scheme designed to achieve an unlawful objective.

## COUNSEL

Christopher G. Renner (argued), Jenner & Block LLP, Chicago, Illinois; Douglas E. Litvack, Jenner & Block LLP, Washington, D.C.; David M. Gossett, Davis Wright Tremaine LLP, Washington, D.C.; Adam S. Sieff, Davis Wright Tremaine LLP, Los Angeles, California; Everett W. Jack Jr., John F. McGrory Jr., and Ashlee M. Aguiar, Davis Wright Tremaine LLP, Portland, Oregon; for Plaintiff-Appellant.

Jerrold Abeles (argued), Wendy Qiu, and Brian D. Schneider, Arent Fox LLP, Los Angeles, California, for

Defendants-Appellees Bright MLS, Inc. and Midwest Real Estate Data LLC.

Robert J. Hicks (argued), Theodore K. Stream, and Andrea Rodriguez, Stream Kim Hicks Wrage and Alfaro PC, Riverside, California, for Defendant-Appellee California Regional Multiple Listing Service, Inc.

Ethan Glass (argued), William A. Burck, Derek L. Shaffer, Michael D. Bonanno, Peter Benson, and Kathleen Lanigan, Quinn Emanuel Urquhart & Sullivan LLP, Washington, D.C., for Defendant-Appellee National Association of Realtors.

Steven J. Mintz (argued), Daniel E. Haar, and Nickolai G. Levin, Attorneys; Richard A. Powers, Acting Assistant Attorney General; Antitrust Division, United States Department of Justice, Washington, D.C., for Amicus Curiae United States of America.

Laura M. Alexander, American Antitrust Institute, Washington, D.C., for Amicus Curiae American Antitrust Institute.

Christopher M. Wyant, K&L Gates LLP, Seattle, Washington; Andrew Mann, K&L Gates LLP, Washington, D.C.; for Amici Curiae Law Professors.

## OPINION

M. SMITH, Circuit Judge:

The PLS.com, a new entrant in the real estate network services market after decades of there being little or no

competition in that market, alleges that its entrenched competitors violated the antitrust laws because they conspired to take anticompetitive measures to prevent it from gaining a foothold in the market. The district court dismissed PLS's complaint without leave to amend because it concluded PLS did not, and could not, adequately allege antitrust injury. We reverse.

## FACTUAL BACKGROUND

Most people seeking to buy or sell a home hire a real estate agent to assist them with the process.[1] Agents assist sellers by marketing their homes, and they assist buyers by finding homes that match their preferences. To do so, most agents pay monthly fees to access multiple listing services (MLSs), which are databases of homes for sale in certain geographic areas. For example, the California Regional Multiple Listing Service (CRMLS) lists homes for sale in parts of California; the Bright MLS lists homes for sale in parts of New Jersey, Delaware, Maryland, Pennsylvania, West Virginia, Virginia, and Washington, D.C.; and Midwest Real Estate Data, LLC (MRED) lists homes for sale in parts of Illinois, Wisconsin, and Indiana.

Most MLSs are owned and controlled by members of the National Association of Realtors (NAR), a trade association to which the "vast majority" of residential real estate agents

---

[1] This account is based entirely on the allegations in PLS's complaint, which we must accept as true at this stage of the litigation. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1266 (9th Cir. 2022). The complaint distinguishes between real estate "agents" and "brokers," and uses the term "real estate professional" to refer to both collectively. Because this distinction does not affect our analysis, we use the term "agent" to refer to agents and brokers collectively.

belong. There are approximately 600 NAR-affiliated MLSs
in the United States, and CRMLS, Bright, and MRED each
contain "over 65 percent of residential real estate listings
marketed by licensed real estate professionals in their
respective service areas." Residential real estate agents
"regard participation in their local MLS as critical to their
ability to compete."

Most sellers prefer to list their homes on NAR-affiliated
MLSs to reach the widest possible range of buyers, but some
sellers prefer not to do so because they do not wish to share
all of the information NAR-affiliated MLSs require. For
instance, a public figure may not wish to share certain details
about his or her home with an entire MLS. Listings that are
not shared on a NAR-affiliated MLS are sometimes called
"pocket listings."

Historically, pocket listings were marketed through face-
to-face communications, telephone calls, or email. In 2017,
as "[d]emand for pocket listing[s] . . . skyrocketed," a group
of real estate agents created PLS, which was a database
similar to an MLS, but that allowed sellers to choose how
much information to share, and that included listings
anywhere in the United States rather than just in a particular
region. PLS was open to any agent who wished to join, and
agents who joined were charged less than they were by the
MLSs. PLS grew rapidly, and by late 2019 had 20,000
members who "were cooperating to sell billions of dollars of
residential real estate listings nationwide."

Even before PLS was formed, NAR and several MLSs,
including CRMLS, Bright MLS, and MRED, became
concerned with the growth of pocket listings. A 2015 NAR
study warned, "Off-MLS listings may contribute to the
unraveling of the MLS as we know it, and its replacement by
a private network that serves to benefit a certain group of

participants." Another NAR study cautioned, "A number of industry initiatives suggest that the current MLS-centric era might be coming to an end. After half a century of operating as the only gateway, there is a strong likelihood that the MLS may lose its exclusive positioning as the principal source of real estate listings."

Two years after PLS launched, NAR's "MLS Technology and Emerging Issues Advisory Board" voted to recommend that NAR adopt a policy that would require agents posting listings on competing services to also post those listings on the appropriate MLS. A month later, CRMLS, Bright MLS, MRED, and other MLSs issued a white paper "that called for collective action to address the threat to the MLS system presented by the rise of pocket listings and the prospect of a competing listing network that would aggregate such listings." A month after that, Bright MLS adopted a policy consistent with the NAR board's recommendation, and CRMLS, Bright MLS, and MRED met with other NAR-affiliated MLSs "at a [Council of Multiple Listing Services] conference in Salt Lake City, Utah to discuss the competitive threat presented by pocket listings and the need for NAR to take action at the upcoming NAR Convention to eliminate that threat through adoption of" the policy nationwide. MRED's CEO "explained that the [policy] was motivated by concerns that pocket listings were 'making the MLS less valuable.'"

The next month, NAR adopted the Clear Cooperation Policy, which provides: "Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants." This new policy meant that members of a NAR-affiliated MLS who chose to list properties on PLS were required to also list those properties on an MLS. Agents

who did not comply faced severe penalties, including in some cases several-thousand dollar fines, or suspension from, or termination of, their access to the MLS.

"NAR-affiliated MLSs and [the Council of Multiple Listing Services] have admitted that the purpose of the Clear Cooperation Policy was to maintain the market dominance of the NAR-affiliated MLS system, and specifically to exclude PLS." PLS alleges that the Clear Cooperation Policy has had its intended effect: After the Clear Cooperation Policy was adopted, "[l]istings were removed from PLS and submitted instead to NAR-affiliated MLSs," "[a]gent participation in PLS declined," and "PLS was foreclosed from the commercial opportunities necessary to innovate and grow" "a critical mass of members and listings to create a powerful network effect."

PLS also alleges that the Clear Cooperation Policy "harmed PLS and consumers in the relevant market by excluding PLS." Based on PLS's briefing, we initially understood this allegation to mean that PLS was driven from the market.[2] At oral argument, however, PLS conceded that it did not allege that the Clear Cooperation Policy drove it from the market, and instead directed us to a news article, which is not cited in the complaint, that suggests that PLS has exited the market. Although the parties seem to agree that PLS is no longer in the listing network services market, our analysis at this stage is confined to the allegations in the

---

[2] For example, PLS cites to this part of the complaint and states that "competition from listing networks such as PLS that competed with the MLSs was eliminated." In its reply brief, PLS argues that "the graveyard of the MLS Defendants' former direct competitors—like PLS and the Top Agent Network—proves that Clear Cooperation *actually succeeded* at having [the] practical effect" of "driving those competitors out of business."

complaint, so we proceed on the understanding that the Clear Cooperation Policy injured PLS but did not drive it from the market.

## PROCEDURAL BACKGROUND

Roughly seven months after the Clear Cooperation Policy was adopted, PLS filed suit, alleging that the Clear Cooperation Policy is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 1670(a)–(c) of California's Cartwright Act.[3] PLS seeks treble damages for its "lost profits and damaged equity and goodwill" and a permanent injunction prohibiting Defendants from enforcing the Clear Cooperation Policy.

Defendants moved to dismiss, arguing that PLS failed to state a claim. The district court granted the motions to dismiss because it concluded that PLS did not allege antitrust injury, and it denied PLS leave to amend because it determined that PLS could not cure this deficiency. The district court also held that PLS did not adequately allege that MRED participated in the alleged conspiracy. PLS timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court's dismissal of the complaint de novo. *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 451 (9th Cir. 2021). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*

---

[3] PLS's claim is brought via the Clayton Act, 15 U.S.C. § 15, which provides a private right of action for enforcing the Sherman Act and other federal antitrust laws.

*v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Cartwright Act analysis mirrors the Sherman Act analysis, so we analyze both claims together. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

## ANALYSIS

## I

At the outset, we hold that the district court erred when it held that PLS did not adequately allege antitrust injury because it did not allege harm to home buyers and sellers.

We begin with some general principles. The purpose of the Sherman Act is "the promotion of consumer welfare." *GTE Sylvania Inc. v. Cont'l T.V., Inc.*, 537 F.2d 980, 1003 (9th Cir. 1976). Therefore, the Act seeks "to preserve competition for the benefit of consumers," not competitors. *Am. Ad Mgmt. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). But sometimes harm to a competitor also harms competition which, in turn, harms consumers. For example, predatory pricing designed to eliminate "competitors in the short run and reduc[e] competition in the long run . . . harms both competitors *and* competition" if the predator can raise prices above the competitive level after its rivals are driven from the market. *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 117–18 (1986).

Congress has allowed competitors to enforce the antitrust laws only when they have experienced an "antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). In other words, a

competitor has standing to assert a Sherman Act claim "only when the claimed injury flows from acts harmful to consumers." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir. 1995). This requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990).

The district court held that these principles required PLS to allege that the Clear Cooperation Policy directly harmed "*ultimate* consumers"—which the court identified as "home buyers and sellers"—to allege antitrust injury. (emphasis added). According to the district court, PLS did not allege antitrust injury because "PLS [did] not adequately allege that the Clear Cooperation Policy has increased prices for services purchased or otherwise paid for by home sellers and buyers or that home sellers and buyers have been denied brokerage services that they desire as a result of the Clear Cooperation Policy." The legal basis for the district court's conclusion is not clear. The district court appears to have understood the term "consumer" to mean something like one "who buys goods or services for personal, family, or household use, with no intention of resale." *Consumer*, *Black's Law Dictionary* (11th ed. 2019). But our use of the term in the antitrust context has not been so limited. As our opinion in *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367 (9th Cir. 2003) demonstrates, a business that uses a product as an input to create another product or service is a consumer of that input for antitrust purposes and can allege antitrust injury.

In that case, Tektronix and Avid Technology were the only manufacturers of "non-linear editing systems" that were used by film production companies to edit movies and

television shows. *Id.* at 368. Glen Holly purchased Tektronix's machines and leased them to digital film companies or used them itself to provide editing services for those companies. *Id.* at 369. Tektronix and Avid unexpectedly formed an "alliance" and Tektronix agreed not to sell its product anymore. *Id.* Glen Holly, which had purchased only Tektronix's product, was forced out of business when its customers "refuse[d] to have their films edited with [Tektronix's] technology after they discovered that the system had been discontinued" and Glen Holly could not switch to Avid's product due to its cost and "insurmountable change-over complications." *Id.* at 370.

Throughout the opinion, we characterized Glen Holly as a "consumer-purchaser" and a "customer-consumer" of Tektronix's products and held that the alliance harmed competition because it "limited consumers' choice to one source of output." *Id.* at 368–69, 374. We also used "consumer" and "customer" interchangeably, explaining, for example, that "*customers* are the intended beneficiaries of competition, and . . . *customers* are presumptively those injured by its unlawful elimination." *Id.* at 378 (emphasis added). We ultimately held that Glen Holly adequately alleged antitrust injury even though it was not an "ultimate consumer" of movies and television shows. *See id.* at 374–78.

As *Glen Holly* makes clear, our use of the term "consumer" is not limited to "ultimate consumers" as the district court appears to have understood the term. Businesses that use a product or service as an input to provide another product or service can be consumers for antitrust purposes. Therefore, PLS was not required to allege harm to home buyers and sellers to allege antitrust injury. Its allegation that the Clear Cooperation Policy harmed real

estate agents—who are the consumers of PLS's and the
MLSs' listing network services—may suffice.

## II

Our conclusion that PLS can adequately allege antitrust
injury without alleging harm to an "ultimate consumer" does
not answer the question of whether it has actually done so.
To allege antitrust injury, PLS must allege "(1) unlawful
conduct, (2) causing an injury to [PLS], (3) that flows from
that which makes the conduct unlawful, and (4) that is of the
type the antitrust laws were intended to prevent." *Am. Ad
Mgmt.*, 190 F.3d at 1055. "Without a violation of the
antitrust laws, there can be no antitrust injury." *Id.* at 1056.

## A

We consider first whether PLS has adequately alleged a
Sherman Act violation. The Sherman Act prohibits "[e]very
contract, combination . . . or conspiracy in restraint of trade."
15 U.S.C. § 1. The Supreme Court has interpreted this
language to "prohibit only *unreasonable* restraints of trade."
*NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85,
98 (1984) (emphasis added). We use two kinds of analysis
to determine whether a restraint of trade is unreasonable: the
*per se* approach and the rule of reason. Some practices are
"so harmful to competition and so rarely prove justified that
the antitrust laws do not require proof that an agreement of
that kind is, in fact, anticompetitive in the particular
circumstances." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128,
133 (1998). These practices are *per se* violations of the
Sherman Act, and we presume that they are anticompetitive
"without inquiry into the particular market context in which
[they] are found." *Bd. of Regents of Univ. of Okla.*, 468 U.S.
at 100.

Most restraints, however, are subject to the rule of reason. *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure . . . to assess the restraint's actual effect' on competition." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (cleaned up) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). A "three-step, burden-shifting framework" guides courts' analysis. *Id.* "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

A plaintiff can establish a substantial anticompetitive effect for purposes of the first step of the rule of reason analysis either "directly or indirectly." *Id.* To prove a substantial anticompetitive effect directly, the plaintiff must provide "'proof of actual detrimental effects [on competition]' such as reduced output, increased prices, or decreased quality in the relevant market." *Id.* (quoting *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460 (1986)). When a plaintiff does so, no "inquir[y] into market definition and market power" is required. *Ind. Fed'n of Dentists*, 476 U.S. at 460–61. To prove a substantial anticompetitive effect indirectly, a plaintiff must show that the defendants have market power in the relevant market and that "the challenged restraint harms competition." *Am. Express Co.*, 138 S. Ct. at 2284.

PLS argues that the Clear Cooperation Policy is an unreasonable restraint of trade because it is an unlawful group boycott.[4] Our court has found the following description of a group boycott from the D.C. Circuit to be helpful:

> The classic "group boycott" is a concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level. Typically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors, by inducing customers not to buy from them, or, in some cases, by refusing to deal with would-be competitors themselves. In each instance, however, the hallmark of the "group boycott" is the effort of competitors to "barricade themselves from competition at their own level."

*Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978) (quoting L.A. Sullivan, Antitrust 230, 232, 244–45 (1977)) (footnotes omitted); *accord Oakland Raiders*, 20 F.4th at 453 n.5.

---

[4] PLS also argues that the Policy is an agreement to restrict output. Because we conclude that PLS adequately alleged a violation of the Sherman Act through its group boycott theory, we decline to address its alternative theory.

The Clear Cooperation Policy, as PLS characterizes it, shares all the hallmarks of a group boycott: PLS's competitors coerced its suppliers (sellers' agents) not to supply PLS with listings (or to do so only on highly unfavorable terms), and they did so for the express purpose of preventing PLS, a new entrant to the market after decades of little to no competition, from competing with the MLSs. *See NYNEX Corp.*, 525 U.S. at 135 (describing "a group boycott in the strongest sense" as when a "group of competitors threaten[s] to withhold business from third parties unless those third parties . . . help them injure their directly competing rivals"). PLS also alleges that the effort succeeded: "Listings were removed from PLS and submitted instead to NAR-affiliated MLSs," "[a]gent participation in PLS declined," and "PLS was foreclosed from the commercial opportunities necessary to innovate and grow." Therefore, PLS has adequately alleged a group boycott.

The district court appeared to agree with this conclusion when it held that PLS adequately alleged that "the Clear Cooperation Policy is a *prima facie* unreasonable restraint of trade under the Rule of Reason framework." But to the extent the district court's reference to the rule of reason implicitly dismissed PLS's *per se* claim, the district court erred. Precisely which group boycotts qualify as *per se* violations of the Sherman Act has been a source of confusion for decades. In 1985, the Supreme Court observed that "[t]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing, Co.*, 472 U.S. 284, 294 (1985) (quoting L. Sullivan, Law of Antitrust 229–30 (1977)). In that case, the Court held that a group boycott "generally" falls into the *per se* category if "the boycotting firms possess[] a dominant position in the relevant market,"

they "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," and the practice is "not justified by plausible arguments that [it was] intended to enhance overall efficiency and make markets more competitive." *Id.* at 294. At the same time, "a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Id.* at 295. The Court has provided little guidance since then.

Defendants argue that the Policy is not a *per se* group boycott because (1) it "does not cut off access to anything, and brokers remain free to use PLS or any other listing service," (2) "on its face" it does not prevent real estate agents from posting listings on competing networks or from "making a choice about the listing network platforms in which they choose to participate," and (3) it is procompetitive.[5] These arguments are not persuasive.

First, a group of competitors coercing a competitor's suppliers to sell to that competitor only on "unfavorable terms" constitutes a group boycott even if the competitors do not completely cut off the competitor's access to inputs it needs. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209, 213 (1959). That is because businesses that can obtain those inputs only on unfavorable terms are unlikely to

---

[5] Defendants do not seriously dispute that PLS has adequately alleged that they have market power. Defendants' only argument regarding market power is a single line in NAR's brief, which states: "PLS's hazy, speculative allegations about market share do not plead the necessary evidentiary facts to support its claims about market power.'" (Citation and quotation marks omitted). But NAR never explains *why* it believes PLS's allegations are inadequate, and "a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

be able to compete. *See Nw. Wholesale Stationers*, 472 U.S. at 295 n.6 (noting that "a concerted refusal to deal . . . *on substantially equal terms* . . . might justify *per se* invalidation if it place[s] a competing firm at a severe competitive disadvantage" (emphasis added)); *see also Ind. Fed'n of Dentists*, 476 U.S. at 458 (characterizing a group boycott as "a concerted refusal to deal *on particular terms*" (emphasis added)).

Here, the Clear Cooperation Policy impaired PLS's ability to compete against the MLSs in the market for sellers' listings on almost any dimension because it requires the vast majority of PLS's suppliers (sellers' agents that are members of a NAR-affiliated MLS) to supply to PLS's dominant competitors (NAR-affiliated MLSs) even if PLS's product is better on the merits. Regardless of what PLS does—whether it charges less to list properties, provides a nationwide network, or develops a better interface—agents who belong to a NAR-affiliated MLS may not list on PLS without also listing on an MLS. Thus, the Clear Cooperation Policy essentially *eliminates* competition for most sellers' agents' listings between NAR-affiliated MLSs and rival services.

Defendants' second argument—that the Clear Cooperation Policy is not coercive because sellers' agents who wish to place some listings exclusively on competing services may do so if they give up their access to the MLSs—is even less persuasive. That is precisely the dilemma the Sherman Act is designed to prevent. In *every* group boycott, the dominant firms force their suppliers or customers to choose between assisting the dominant firms in injuring their competitors or working exclusively with those competitors, knowing that because of the dominant firms' market power very few suppliers or customers will be able to rely exclusively on the competitors. That the customers or

suppliers technically have a choice does not mean the group boycott is not coercive.

Finally, Defendants argue that the Clear Cooperation Policy is procompetitive because it "reduc[es] search and transaction costs." Although this contention is dressed up in the language of economics, at its core it is just an argument that the Clear Cooperation Policy benefits buyers' agents because it allows them to see more listings on the MLSs and to avoid the need to consult competing services. This is not a procompetitive justification because it does not explain how the Clear Cooperation Policy enhances *competition*. At bottom, Defendants argue that the Clear Cooperation Policy results in a higher quality product: a listing service with all of the publicly available listings in one place. But justifying a restraint on competition based on an assumption it will improve a product's quality "is nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978). The antitrust laws assume that "competition will produce not only lower prices, but also better goods and services." *Id.* If Defendants are correct that buyers' agents prefer listing networks that offer more listings in one place, the MLSs should be in a good position to compete with upstarts like PLS. But the fact that PLS was growing rapidly despite the MLSs' larger inventory of listings might suggest that PLS offered features that at least some buyers' agents found attractive, despite the lower concentration of listings. In the end, sparing consumers the need to patronize competing firms is not a procompetitive justification for a group boycott. *See id.* at 689 (rejecting "the argument that because of the special characteristics of a particular industry, monopolistic arrangements will better promote trade and commerce than competition").

Although we hold that PLS has adequately alleged a *per se* group boycott, we leave to the district court to determine in the first instance whether it should apply *per se* analysis or rule of reason analysis at later stages in this litigation.

## B

Defendants next argue that PLS failed to state a claim because it did not define the market properly, and did not allege injury to participants on both sides of the market, as they contend is required by *Ohio v. American Express Company*, 138 S. Ct. 2274 (2018) (*Amex*). PLS responds that *Amex* does not apply here, both because it does not apply at the pleading stage and because it applies only to two-sided platforms that facilitate simultaneous transactions, like credit-card networks. PLS also argues that it has satisfied *Amex* even if it does apply. We hold that *Amex* can apply at the pleading stage in some circumstances, but that PLS has satisfied *Amex*, so we need not resolve the more difficult questions the parties raise about how broadly the *Amex* decision applies.

## (1)

In *Amex*, the federal government and several states sought to prove that an anti-steering provision American Express (Amex) imposed on merchants who chose to accept its cards violated Section 1 of the Sherman Act. *See* 138 S. Ct. at 2283. To understand the Court's decision, one must first have a basic understanding of Amex's business model. Briefly stated, credit-card companies earn revenue by charging merchants fees, which are generally calculated as a percentage of each transaction. *Id.* at 2281. Amex earns most of its revenue from these fees, and Amex generally charges merchants a higher percentage of each transaction than do its rivals. *Id.* at 2282. As a result, merchants sometimes attempt

to persuade or incentivize customers to use different cards to make their purchases. *Id.* at 2283. "This practice is known as 'steering.'" *Id.* Amex's anti-steering provision prohibits merchants who accept its cards from steering customers toward using other credit cards. *Id.*

After a bench trial, the district court held that Amex's anti-steering provision violates the Sherman Act based on the rule of reason because Amex has market power in the transaction-processing market and has used that market power to prohibit merchants from steering their customers toward lower-cost cards, thereby "short-circuit[ing] the ordinary price-setting mechanism" and eliminating "price competition among American Express and its rival networks." *See United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 151–52 (E.D.N.Y. 2015). The Supreme Court ultimately reversed and provided new instructions about how to define the relevant market when analyzing a product that is a two-sided platform.

According to the Court, "a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them." *Amex*, 138 S. Ct. at 2280. The Court offered two examples: credit-card companies and newspapers. *See id.* at 2285–86. Credit card companies, the Court explained, sell credit to consumers on one side of the market and sell transaction-processing services to merchants on the other side of the market. *Id.* at 2280. Newspapers are also "arguably" two-sided platforms: they sell advertising space to advertisers and news to subscribers. *Id.* at 2286. The key difference between two-sided platforms and traditional products is that two-sided platforms "often exhibit what economists call 'indirect network effects,' . . . where the value of the two-sided platform to one group of participants depends on how

many members of a different group participate." *Id.* at 2280. "A credit card, for example, is more valuable to cardholders when more merchants accept it, and is more valuable to merchants when more cardholders use it." *Id.* at 2281.

The Court held that, for at least certain subsets of two-sided platforms, courts must define the relevant market to "include both sides of the platform" because one cannot accurately assess the competitive impact of a particular practice by looking to only one side of the market. *Id.* at 2286–87.[6] For instance, a credit card company might choose to increase merchant fees and use the increased revenue to offer more generous rewards for cardholders, thus reducing the price to cardholders and keeping the overall cost of the credit card service the same. *Id.* at 2281. The plaintiffs in *Amex* failed to prove an anticompetitive effect at the first step of the rule of reason analysis, the Court held, because they "wrongly focus[ed] on only one side of the two-sided credit-card market." *Id.* at 2287. To meet their burden of proof, they were required to prove anticompetitive effects "on the two-sided credit-card market as a whole." *Id.* In other words, they were required to prove that the "provisions increased the cost of credit-card transactions above a competitive level, reduced the number of credit-card transactions, or otherwise stifled competition in the credit-card market." *Id.*

---

[6] However, "it is not always necessary to consider both sides of a two-sided platform." *Id.* at 2286. For example, "the market for newspaper advertising behaves much like a one-sided market and should be analyzed as such." *Id.*

**(2)**

PLS argues that *Amex* has no role to play at the pleading stage because the proper definition of the market and whether a practice is anticompetitive "are fact-bound issues not susceptible to resolution on a motion to dismiss." We disagree.

A plaintiff is not required to define a particular market for a *per se* claim, *see Bd. of Regents of Univ. of Okla.*, 468 U.S. at 100; *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999), nor is it required to do so for a rule of reason claim based on evidence of the actual anticompetitive impact of the challenged practice, *see Ind. Fed'n of Dentists*, 476 U.S. at 460–61.[7] PLS is therefore correct that *Amex* does not apply to these claims. For rule of reason claims based on indirect evidence, however, *Amex* may play a role. For those claims, a plaintiff must define the relevant market and show that the defendant has market power in that market to prove that the challenged practice is anticompetitive. *See Amex*, 138 S. Ct. at 2284. Since these are elements of the claim, the plaintiff must plead facts that, when accepted as true, show they are satisfied. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). If "the alleged market suffers a fatal legal defect," the court may dismiss the claim at the pleading stage. *Id.* at 1045.

---

[7] In *Amex*, the Supreme Court held that the plaintiffs were required to define the relevant market even though they relied on direct evidence of an anticompetitive impact. *See Amex*, 138 S. Ct. at 2285 n.7. But the Court distinguished *Amex*, where the plaintiff complained of a vertical restraint of trade, from cases like this one, where the plaintiff complains of a horizontal restraint of trade. *Id.* Therefore, *Amex* did not disturb the *Indiana Federation of Dentists* rule.

Although we hold that *Amex can* apply to rule of reason claims based on indirect evidence at the pleading stage, we do not hold that it always does. Under both parties' theories, whether *Amex* applies depends on the characteristics of the relevant product. Defendants argue that strong indirect network effects alone trigger *Amex*, while PLS argues that simultaneous transactions are required. Either way, whether *Amex* applies depends on the facts. In some cases, a plaintiff will include facts in the complaint that disclose these characteristics and thus trigger *Amex*. In others, the complaint will not contain the necessary facts, and the court may need to wait to examine the evidence to determine whether *Amex* applies.

In this case, PLS alleges that the listing networks do not facilitate simultaneous transactions, but they nevertheless exhibit strong indirect network effects. Therefore, if PLS is correct that *Amex* applies only to transaction networks, it does not apply here. But if Defendants are correct that only strong indirect network effects are required, then *Amex does* apply because PLS alleged that the relevant products exhibit strong indirect network effects. We need not resolve the parties' dispute regarding the precise characteristics that trigger *Amex*, however, because PLS's allegations satisfy *Amex*, even if it applies.

**(3)**

The district court held that PLS failed to satisfy *Amex* because "PLS does not allege a plausible injury to participants on both sides of the market," namely to "*both* home sellers *and home buyers*." Defendants also argue that PLS failed to satisfy *Amex* because it did not "take account of the impact of the Policy on home buyers (or their agents)." As we have explained, the relevant consumers in this case are buyers' and sellers' *agents*, not the people buying and

selling homes. But even substituting buyers' agents and sellers' agents for the references to buyers and sellers, we find ourselves puzzled by Defendants' argument.

As a preliminary matter, *Amex* does not require a plaintiff to allege harm to participants on both sides of the market. All *Amex* held is that to establish that a practice is anticompetitive in certain two-sided markets, the plaintiff must establish an anticompetitive impact on the "market as a whole." 138 S. Ct. at 2287. Sometimes this will be by alleging harm to participants on both sides of the market and sometimes it will not. It is possible that a practice harming participants on one side of the market could outweigh the benefits to participants on the other, causing anticompetitive effects on the market as a whole.

More importantly, although it is not required, PLS *did* allege that the Clear Cooperation Policy harms competition in the real estate listing network services market because it injures *both* sellers' agents *and* buyers' agents. PLS alleges that the Clear Cooperation Policy prevented innovative competitors from entering the market and growing large enough to meaningfully compete with the MLSs, leaving both buyers' agents and sellers' agents with fewer choices, supra-competitive prices, and lower quality products. Defendants suggest that the purported benefits of the Clear Cooperation Policy to buyers' agents outweigh the costs to buyers' agents and sellers' agents, so PLS did not adequately allege harm to the market as a whole. But whether the alleged procompetitive benefits of the Clear Cooperation Policy outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings. *See Amex*, 138 S. Ct. at 2284 (describing the rule of reason as a "fact-specific assessment" designed to

distinguish between anticompetitive and procompetitive practices).

In sum, even if *Amex* were to apply to PLS's indirect evidence claim, PLS's allegations satisfy *Amex's* requirements.

## III

Having concluded that PLS has adequately alleged a Sherman Act violation, we next examine the relationship between that violation and PLS's injury to determine whether PLS has adequately alleged antitrust injury. We hold that it has.

We find our precedent regarding antitrust injury in the context of predatory pricing to provide a helpful guide. The Supreme Court has held that a competitor can adequately allege antitrust injury when it alleges that it has been injured by a competitor's predatory pricing. *See Cargill*, 479 U.S. at 117–18. "Predatory pricing [is] pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Id.* at 117. It "harms both competitors *and* competition" because it "has as its aim the elimination of competition." *Id.* at 118. At the same time, the Court has made clear that a competitor that loses profits or market share due to a competitor's *non*-predatory price cuts does not experience antitrust injury because non-predatory price competition is procompetitive. *Id.* at 116–17.

The same reasoning applies to group boycotts: the Sherman Act prohibits group boycotts because they are designed to drive existing competitors out of the market or to prevent new competitors from entering, thus leaving consumers with fewer choices, higher prices, and lower-

quality products. PLS alleges that is what happened here: the Clear Cooperation Policy prevented PLS from gaining a foothold in the market and makes it virtually impossible for new competitors to enter, leaving agents with fewer choices, supra-competitive prices, and lower quality products. Therefore, PLS has adequately alleged antitrust injury. *See Am. Needle*, *Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) ("[T]he 'central evil addressed by Sherman Act § 1' is the 'elimin[ation of] competition that would otherwise exist.'" (quoting 7 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1462b, at 193–94 (2d ed. 2003))).

Defendants cite an out-of-context quotation from *Pool Water Products v. Olin Corporation*, 258 F.3d 1024 (9th Cir. 2001), to argue that decreased market share and shifting sales from one competitor to another can never constitute antitrust injuries. They suggest that because PLS does not allege that it was driven from the market entirely, there was no antitrust injury. But that is not what *Pool Water* held. In *Pool Water*, we held that the plaintiffs had "not presented any evidence that [the defendants] engaged in predatory pricing. Plaintiffs' reduced profits attributable to defendants' decrease in prices [was] therefore not an antitrust injury." *Id.* at 1036 (citations omitted). Nor was the plaintiffs' decreased market share. *Id.* Thus, *Pool Water* simply reiterated what the Supreme Court had already made clear: injuries due to lower prices are not antitrust injuries unless those lower prices are predatory. It did not hold that injuries short of being forced from the market—such as shifting sales or decreased market share—*never* constitute antitrust injuries.

Contrary to Defendants' argument, the Supreme Court has long recognized that "competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." *Brunswick*

*Corp.*, 429 U.S. at 489 n.14. And we recently reaffirmed that "a plaintiff need not allege that the exclusionary conduct has succeeded in displacing all competition" to "adequately plead antitrust injury." *Ellis*, 24 F.4th at 1274. Therefore, the fact that PLS does not allege that it was driven from the market does not mean that it failed to allege antitrust injury.

## IV

Bright MLS and MRED argue that we should affirm the district court's dismissal of PLS's claims against them even if we hold that PLS has stated a claim against the other Defendants because PLS did not adequately allege that they were involved in the alleged conspiracy. Before turning to the merits of these arguments, we must first determine whether we have jurisdiction to consider the parties' dispute regarding MRED's involvement.

## A

At the time of PLS's appeal, Federal Rule of Appellate Procedure 3(c)(1)(B) required a party to "designate" in its notice of appeal "the judgment, order, or part thereof being appealed."[8] This requirement is jurisdictional, so we must assure ourselves that it is satisfied, even though no party has raised it. *Smith v. Barry*, 502 U.S. 244, 248 (1992). PLS's

---

[8] Rule 3(c)(1)(B) was amended in April 2021 to eliminate the "or part thereof" language because the advisory committee concluded that it contributed to "the misconception that it is necessary or appropriate to designate each and every order of the district court that the appellant may wish to challenge on appeal" rather than simply designating the judgment into which all of the district court's orders merge.

Fed. R. App. P. 3(c) advisory committee's note to 2021 amendment. We quote the former language because the 2021 amendment did not become effective until several months after PLS filed its notice of appeal.

notice of appeal identifies the object of its appeal as "Subsection 1 of Order (ECF 97) dismissing First Amended Complaint with prejudice and without leave to amend." This portion of the order addresses only whether PLS adequately alleged antitrust injury. But PLS's opening brief also challenges the district court's holding in Subsection 3 of its order that PLS did not adequately allege that MRED was part of the alleged conspiracy. If PLS had simply designated the entire order or the district court's judgment as the object of its appeal, we would clearly have jurisdiction to review Subsection 3. But PLS's designation of only Subsection 1 muddies the waters. Nevertheless, we hold that we have jurisdiction to review Subsection 3.

We have not required technical compliance with Rule 3(c)(1)(B). *Le v. Astrue*, 558 F.3d 1019, 1022 (9th Cir. 2009). To determine whether we have jurisdiction to entertain an appeal from a portion of an order that is not designated in the notice of appeal, we have applied a two-part test. *See id.* at 1022–23. At the first step, we determine "whether the intent to appeal a specific judgment can be fairly inferred," and at the second step, we analyze "whether the appellee was prejudiced." *Id.* at 1023 (quoting *Lolli v. Cnty. of Orange*, 351 F.3d 410, 414 (9th Cir. 2003)).

When examining whether the appellant's intent to appeal a portion of an order can be fairly inferred, we have not limited ourselves to inferences from the face of the notice of appeal; we have also inferred "appellants' intent to appeal . . . from their briefs," and from an appellant appealing another portion of the same order. *West v. United States*, 853 F.3d 520, 524 (9th Cir. 2017) (holding that notice of appeal designating the district court's dismissal of some counts against one defendant "sufficiently indicated [the plaintiff's] intent to appeal the entire district court order,"

including the dismissal of the plaintiff's claims against another defendant); *see also Le*, 558 F.3d at 1021, 1024–25. In addition, we have held that when an "appellee has argued the merits [of the disputed issue] fully in its brief, it has not been prejudiced by the appellant's failure to designate specifically an order which is subject to appeal." *Le*, 558 F.3d at 1025 (quoting *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764, 772 (9th Cir. 1991)). PLS's opening brief notified Defendants that it sought to appeal Subsection 3 of the district court's order and Defendants have fully briefed the issue. We therefore have jurisdiction to address the district court's holding that PLS did not adequately allege that MRED was involved in the alleged conspiracy.

**B**

Turning to the merits, we hold that PLS adequately alleged that Bright and MRED were involved in the alleged conspiracy. "Section 1 applies only to concerted action that restrains trade." *Am. Needle*, 560 U.S. at 190. Therefore, to adequately allege that Defendants violated Section 1, PLS must allege that Defendants' conduct was concerted action and was "not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. A formal agreement is not necessary. *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939). All that is required is "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (quoting *Edward J. Sweeney & Sons*, *Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980)).

PLS has satisfied this requirement. Specifically, PLS alleges that MRED and other MLSs conceived of the Clear Cooperation Policy through "private interfirm

communications," including at a meeting of "NAR's MLS Technology and Emerging Issues Advisory Board" that MRED's CEO attended. PLS then alleges that MRED, Bright, and CRMLS signed a white paper "call[ing] for collective action to address the threat to the MLS system presented by . . . the prospect of a competing listing network." That same day, "MRED published a statement supporting adoption by NAR of the Clear Cooperation Policy at the upcoming NAR convention." The next day, MRED and other NAR-affiliated MLSs met in Salt Lake City "to discuss the competitive threat presented by pocket listings and the need for NAR to take action at the upcoming NAR Convention to eliminate that threat through adoption of the Clear Cooperation Policy." MRED's CEO and Bright's Chairman both addressed representatives of NAR-affiliated MLSs at the CMLS conference in Salt Lake City and urged them to adopt the Clear Cooperation Policy, and to encourage NAR's Board of Directors to do the same. Bright's CEO said, among other things, "We have an opportunity in front of us to make, put this policy into effect in November. And Bright adopted it yesterday, MRED's already adopted it, other people are already doing it, but we really need to get it through." The next month, Bright and MRED executives advocated for the policy at a meeting of NAR's Multiple Listing Issues and Policies Committee, where the policy was approved. Two days later, NAR's Board of Directors formally adopted it.

These allegations suggest that Bright and MRED agreed to adopt the Clear Cooperation Policy and then worked together to ensure that NAR required it so that every NAR-affiliated MLS would be forced to adopt it too. Therefore, PLS has plausibly alleged that Bright and MRED acted in concert rather than independently.

Bright argues that because PLS alleges it adopted "a version of what would become the Clear Cooperation Policy . . . before having any obligation under NAR rules . . . to do so," PLS has not alleged that it adopted the policy pursuant to an agreement. But PLS is not required to allege that Bright adopted the Policy because of NAR's rule. All that PLS must allege is that Bright adhered to a common scheme. Whether it did so by formally adopting the Clear Cooperation Policy after NAR required it or by voluntarily adopting a substantially equivalent policy beforehand makes no difference. *See Interstate Cir.*, 306 U.S. at 227 ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act.").

## V

We hold that PLS adequately alleged a violation of the Sherman Act and antitrust injury. We therefore reverse the district court's dismissal of PLS's complaint and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**